SPECIALIZED SERVICES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17054–79.     Filed August 25, 1981.

*James E. Johnson, Jr.,* and *Francis J. Blanchfield, Jr.,* for the petitioner.

*Charles P. Hanfman,* for the respondent.

SCOTT, *Judge*: Respondent determined a deficiency in peti-

---

tioner's income tax for taxable year 1976 in the amount of $156,756.

The only issue for decision is whether amounts transferred on December 31, 1976, by one of petitioner's subsidiary corporations to a bank-managed "Escrow Trust Fund," which the subsidiary established to hold funds sufficient in amount for the satisfaction of contested accident claims filed by third-party claimants, constituted transfers of "money or other property to provide for the satisfaction of the asserted liability" within the meaning of section 461(f)(2), I.R.C. 1954.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Specialized Services, Inc. (petitioner), a Delaware corporation, had its principal business office in Atlanta, Ga., at the time of filing its petition in this case. Petitioner and its subsidiary corporations filed a consolidated Federal income tax return for calendar year 1976 with the Internal Revenue Service Center, Chamblee, Ga. Petitioner keeps its books and files its Federal income tax returns on an accrual method of accounting.

Petitioner is engaged in the investment business. One of its subsidiary corporations, Superior Trucking Co., Inc. (Superior), a Georgia corporation, engages in the business of operating motor vehicles as a common carrier of goods.

During the normal course of operating motor vehicles as a common carrier, Superior's employees and equipment have been involved in traffic accidents which have caused damage to the vehicles and their cargo and have inflicted personal injuries on the employees, third parties, and their property. To assure the payment of claims arising from such vehicle accidents, the Interstate Commerce Commission and the States in which Superior operates require that motor common carriers supply insurance coverage or otherwise make satisfactory and sufficient arrangements.[2] At all times relevant to this

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[2]The ICC provisions are set out in 49 C.F.R. sec. 1043.1, which in pertinent part provides as follows:

case, Superior has operated as a common carrier under authority granted by the Interstate Commerce Commission and the appropriate State agencies.

Excalibur Insurance Co. (Excalibur) issued to Superior an insurance policy, effective as of September 1, 1973, which provided 100-percent coverage on third-party claims arising from automobile liability, general liability, cargo legal liability, fire, theft, C.A.C., and collision. This insurance policy remained effective through August 31, 1976. Pursuant to the provisions of the policy, Excalibur's liability was limited to $5 million per occurrence. Among the terms and conditions contained in the policy were a "Liability Limitation and Deductible Endorsement" and an "Indemnification for Aggregate Limit" provision. This deductible did not apply to workman compensation claims. The "Indemnification for Aggregate Limit" section effective as of September 1, 1973, provided for a deductible of $25,000 each occurrence. As a result of the deductible, Superior paid the insurance policy premium based upon a reduced rate.

In conjunction with Superior's insurance program, Superior entered into an agreement with Excalibur and the First National Bank of Atlanta (bank) entitled "Loss Fund Agree-

---

Sec. 1043.1 Surety bond, certificate of insurance, or other securities.

(a) *Property damage; public liability.* Except as provided in paragraph (c) of this section, no common or contract carrier subject to Part II of the Interstate Commerce Act shall engage in interstate or foreign commerce, and no certificate or permit shall be issued to such a carrier or remain in force unless and until there shall have been filed with and accepted by the Commission a surety bond, certificate of insurance, proof of qualifications as a self-insurer, or other securities or agreements, in the amounts prescribed in sec. 1043.2, conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles in transportation subject to Part II, Interstate Commerce Act, or for loss of or damage to property of others.

(b) *Common carriers—cargo insurance; exempt commodities.* Except as provided in paragraph (c) of this section, no common carrier by motor vehicle subject to part II of the Interstate Commerce Act shall engage in interstate or foreign commerce, nor shall any certificate be issued to such a carrier or remain in force unless and until there shall have been filed with and accepted by the Commission, a surety bond, certificate or insurance, proof of qualifications as a self-insurer, or other securities or agreements in the amounts prescribed in sec. 1043.2, conditioned upon such carrier making compensation to shippers or consignees for all property belonging to shippers or consignees and coming into the possession of such carrier in connection with its transportation service: *Provided,* That the requirements of this paragraph shall not apply in connection with the transportation of the following commodities * * *

ment (Establishment of Escrow Trust Fund)," dated September 1, 1973. The loss fund agreement provided that the bank would act as escrow agent for funds placed on deposit for use "to guarantee payment of all liabilities which may be incurred by the Policyholder for which the Insurance Company may be responsible under the terms of an insurance policy or policies." Although the 1973 loss fund agreement specified that Superior would fund the escrow trust fund initially with $10,000, would review the need for additional sums, and would deposit the required funds by the 10th day of each succeeding month, Superior never funded the account under this loss fund agreement.

In July 1976, David B. Whelpley joined Superior as its new president. Upon review of the existing insurance policy and loss fund agreement, Mr. Whelpley determined that changes in these contracts would be in the best interest of Superior. Accordingly, Mr. Whelpley negotiated with Excalibur certain modifications which were incorporated into a revised insurance policy and loss fund agreement. Pursuant to the new insurance policy, Excalibur was responsible for a maximum liability of $5 million per occurrence. The "Liability Limitation and Deductible Endorsement" provided that Excalibur would become "liable only for that portion of loss which exceeds $50,000.00 each occurrence and that the ultimate net loss to be borne by the Company [Excalibur] shall not exceed $4,950,000.00 each occurrence." The $50,000 deductible was inapplicable to workman compensation claims. Unlike the prior insurance policy, the revised policy, effective September 1, 1976, did not contain a specific "Indemnification for Aggregate Limit" provision. Otherwise, the September 1, 1976, policy contained provisions substantially the same as those of the 1973 policy. The "Liability Limitation and Deductible Endorsement" specified that:

Anything in the Policy to the contrary notwithstanding, it is understood and agreed that the maximum limit of liability arising out of the coverages afforded under this Policy shall be $5,000,000.00 each occurrence.

It is further understood and agreed that the Company is liable only for that portion of loss which exceeds $50,000.00 each occurrence and that the ultimate net loss to be borne by the Company shall not exceed $4,950,000.00 each occurrence.

It is, however, further understood that the Company has filed evidence of insurance on behalf of the Named Insured with various State and Federal

Regulatory agencies and that nothing contained in this endorsement shall operate to relieve the Company of its liabilities to the general public as required by law.

In conjunction with the revised insurance policy, on September 1, 1976, Superior entered into a new loss fund agreement with Excalibur and the bank. The 1976 loss fund agreement contained provisions in all material respects the same as the 1973 agreement, with the following exceptions: (1) In conformance with the new insurance policy dated September 1, 1976, Superior's legal liabilities arising from claims due to vehicle accidents increased to a maximum of $50,000 per occurrence; (2) Superior agreed to maintain a balance in the Escrow Trust Fund sufficient to cover 100 percent of all reserves established on such claims; (3) Superior agreed to set up adequate reserves within 30 days of the assertion of such claims; (4) Superior agreed to an initial deposit of $50,000; and (5) the parties deleted the clause in paragraph 3 stating that "unless mutually agreed by the parties hereto in writing, no securities shall be withdrawn from the Escrow Trust Fund except upon mutual agreement in writing between the Policyholder and the Insurance Company, a copy of which agreement shall be provided in Escrow Agent." In pertinent part, the loss fund agreement of September 1, 1976, provided:

THIS AGREEMENT made and entered into this 1st day of September, 1976, by and between Superior Trucking Company, Inc. et al hereinafter called the Policyholder, and the Excalibur Insurance Company hereinafter called the Insurance Company, and The First National Bank of Atlanta hereinafter called the Escrow Agent, for the purpose of creating an Escrow Trust Fund to be placed on deposit by the Policyholder in the name of the Policyholder and the Insurance Company, showing their joint interests therein, in The First National Bank as Escrow Agent; such Escrow Trust Fund to be used to guarantee payment of all liabilities which may be incurred by the Policyholder for which the Insurance Company may be responsible under the terms of an insurance policy or policies and/or contract issued as hereinafter particularly described; such guarantee to consist of mutually acceptable securities.

WHEREAS, the Insurance Company has issued to the Policyholder its Policy No. 210005176 with effective date September 1, 1976, and renewals thereof, expiration date September 1, 1979, providing Auto Liability, General Liability, Cargo Legal Liability, Fire, Theft, C.A.C. and Collision coverages with the understanding and agreement between the Policyholder and the Insurance Company that the Policyholder will be entitled to investigate, settle or defend certain claims arising out of accidents or occurrences, involving questions of legal liability to the extent of $25,000.00

prior to Sept. 1, 1976 and to the extent of $50,000.00 any one accident or occurrence; and that such claims will not be reported to the Insurance Company for investigation, settlement or defense even though the policy or policies or contracts of insurance issued as aforesaid would cover such claims; and,

WHEREAS, the Policyholder is desirous of setting aside and maintaining in an Escrow Trust Fund a sufficient guarantee of funds to be held in reserve for the payment of claims not reported to the Insurance Company so as to guarantee the payment of said claim or claims to any person, organization or corporation who, or which, might perfect such claims against the Policyholder or Insurance Company; and,

WHEREAS, the Policyholder and the Insurance Company are desirous of having said Escrow Trust Fund deposited with the Escrow Agent in a special joint account completely segregated and set apart from the general operating funds of said Policyholder so that, in the event of insolvency or bankruptcy of the Policyholder, such funds cannot be considered as funds available to creditors except as hereinafter set out; and,

WHEREAS, the Insurance Company understands that, in the said event claims or potential claims arising out of accidents or occurrences which are covered under the Insurance Policy or Policies or contracts are not reported promptly to the Insurance Company for investigation, settlement or defense and the Policyholder fails to liquidate or terminate said claims either by settlement or by successful denial of the claim or by final judgment, the Insurance Company would be obligated to pay or defend said claims in accordance with the terms or provisions of said policy or policies or contracts, and also in accordance with the terms and provisions of all pertinent regulatory endorsements attached to and a part of said policy.

IT IS, THEREFORE, AGREED by and between the parties that:

1. The said Escrow Trust Fund will be maintained in deposit with the Escrow Agent, The First National Bank of Atlanta, the initial deposit to be in the amount of $50,000.00, and thereafter, on or before the tenth day of each succeeding month during a period covered by this agreement or any extension thereof, the Policyholder shall deposit in or withdraw from such Escrow Trust Fund such guarantee as may be necessary to maintain a balance in said Escrow Trust Fund sufficient to cover 100% of all reserves established on claims or occurrences covered by the insurance policy or policies or contracts, not to exceed $50,000.00 any amount any one occurrence.

2. The Policyholder agrees to set up adequate reserves within 30 days from which a claim or exposure might arise under said insurance policy or policies or contracts.

3. All persons designated as authorized representatives to draw from the Account shall be covered by a Fidelity Bond in the amount of $250,000.00, and a copy of this bond shall be subject to annual review and may be increased on the amount of funds on deposit in the Escrow Trust Fund.

4. After the close of each calendar month, the Policyholder will furnish the Insurance Company a report of all outstanding or unliquidated claims showing the aggregate reserves for all claimants.

5. The Insurance Company will have the privilege of inspecting all Policyholder claim files and accident records applicable to the. policy or policies or contracts referred to herein for the purpose of determining whether or not the individual reserve amounts assigned to specific claims or claimants are adequate considering the factors of liability and injury or damage therein.

6. The Policyholder and the Insurance Company and the Escrow Agent agree that said Escrow Trust Fund is to be held in trust for the protection of third-party claimants, for the protection of the Insurance Company, and for the payment of claims soon as they are perfected against or settled by the Policyholder; and, the Escrow Trust Fund, as increased or decreased as provided herein, shall not be subject to any conveyance, transfer or assignment or be pledged as security for any debt or obligation of the Policyholder other than for the specific purpose of this agreement, and the same shall not be subject to or liable for any creditor of any parties to this agreement, through legal process, except only to the claim of a creditor who has obtained a final judgment in a court of proper jurisdiction on an insured claim or loss for which a reserve has been established under this agreement.

7. This Escrow Agreement shall not terminate upon the cancellation of said insurance policy but shall become inoperative only when all liability against the Policyholder as insured by the Insurance Company has been finally extinguished and liquidated. In the event of final liquidation of the claims or termination for the reason set out above, the Escrow Agreement shall be terminated and the Escrow Agent shall be directed by mutual agreement of the Policyholder and the Insurance Company to return the remaining securities to the Policyholder.

8. The First National Bank of Atlanta, Escrow Agent may terminate its duty as Escrow Agent under this contract by giving to both the Policyholder and the Insurance Company sixty days' written notice of its intention to do so. The Insurance Company and the Policyholder acting jointly may change the Escrow Agent and relieve said Agent of its duties by giving sixty days' written notice to the Agent of their intention to do so, but in such event, the entire Escrow Trust Fund shall be transferred to some other bank or financial institution to be selected by the Insurance Company and the Policyholder on the same terms and conditions as herein set forth.

9. The Policyholder agrees to provide the Insurance Company and the Escrow Agent, on a quarterly basis, or as otherwise mutually agreed, complete information showing itemized reserves on all outstanding claims; and the Policyholder and the Insurance Company further agree that during the life of this Loss Fund Agreement, as developments occur in connection with the handling of claims, said reserves may be increased or decreased; and further, that in the event of any disagreement between the Policyholder and the Insurance Company as to adequate reserves, the Policyholder and the Insurance Company shall submit the question for arbitration. The Policyholder and the Insurance Company shall each select an experienced claims attorney for the purpose of arbitration; and, in the event of disagreement between these two attorneys, they shall have authority to select a qualified third attorney and the reserve will be adjusted accordingly to the majority opinion of the three participating attorneys.

10. It is further agreed that the Escrow Agent will provide both the Policyholder and the Insurance Company with a quarterly statement describing the securities maintained for the guarantee of funds, including the current market value of said securities.

11. It is further mutually agreed that the Escrow Agent shall be held harmless of all liability in the disbursement of funds in the proper requisition of an authorized and designated representative.

12. Any modification or change in this agreement shall be agreed upon in writing by all the parties thereto.

13. This agreement shall be considered a legal contract and shall be construed in accordance with the laws of the State of Georgia.

14. It is the intention of the Policyholder and the Insurance Company that this agreement comply with all existing statutes, rules and regulations both State and Federal. In the event that this Loss Fund Agreement or any portion thereof is in violation of any statute, rule or regulation, the same shall be amended forthwith to comply with statute, rule or regulation.

Pursuant to Superior's normal business practices, the drivers involved in vehicle accidents were instructed to report them immediately, on a 24-hour-per-day basis, to Superior's claims department. Based upon this initial accident information, one of the following would occur: (1) A claims manager would handle the cargo claims; (2) the casualty claims supervisor would determine from his desk Superior's potential liability for workman compensation cases and bodily and personal property injuries; or (3) the casualty claims supervisor would assign an outside adjuster to inspect the accident. In approximately 75 percent of the cases, Superior hired an outside adjuster. If an outside adjuster was utilized, after he made his initial determination of Superior's estimated liability, he telephoned Superior's claims department with the initial adjustment figure. He mailed his final report to Superior generally within the following 2 weeks.

Once the initial potential liability was estimated by either the claims manager, the casualty claims supervisor, or the adjuster, the staff of the claims department set up a file on each accident. Afterwards, pursuant to Superior's normal procedures, an interdepartmental accident report was circulated and a determination was made as to the amount of reserve funds which Superior should segregate for these claims. If the severity of the accident required that accident reports be sent to Excalibur, to the proper authority in the State in which the accident occurred, and to the department of transportation, Superior forwarded these reports. All acci-

dents involving bodily injury were reported to Excalibur regardless of the potential liability to Superior. Where the potential liability of Superior was estimated to be less than the deductible amount as stated in the insurance policy with Excalibur, Superior would handle all investigations of the claim. For each claim where the estimated exposure of Superior exceeded the deductible amount, Excalibur became responsible for the investigation and Superior's claims department became only peripherally involved. In the event that Superior directly handled and investigated claims which later were not liquidated or terminated by Superior, consistent with the provisions of the insurance policy and the Interstate Commerce Commission regulations, Excalibur was obligated to defend or pay such claim.

Throughout 1976, Superior maintained comprehensive records of each accident including the name of the claimant, the date of the claim, an estimate of the liabilities of Superior and Excalibur, the type of loss, and the amount claimed in any lawsuit instituted as a result of the accident. These records were maintained with regard to cargo claims, public liability arising from property and bodily injury, and workman compensation claims.

At the end of each month, a summary was prepared to indicate the total estimated potential liability, each, of Superior and Excalibur with regard to the outstanding claims in each category of liability. Copies of these reports were submitted to Excalibur throughout 1976. As a means of informing the bank of Superior's estimated claims liabilities, commencing November 1976, Superior furnished the bank a copy of each monthly summary report. In the years following 1976, Superior utilized this reporting system to maintain sufficient reserves in the escrow trust fund in accordance with the loss fund agreement; Superior either regularly would transfer additional cash to the escrow trust fund or would request the bank to return excess amounts contained in the escrow trust fund. After 1976, representatives of Excalibur and Superior met quarterly to review the adequacy of the outstanding claims reserves which Superior had established.

As escrow agent, the bank invested the moneys deposited into the escrow trust fund into cash equivalents such as short-term or master notes.

Although accidents had occurred in each month in 1976 and claims had been asserted against Superior, prior to December 31, 1976, Superior did not transfer any moneys or securities into the escrow trust fund. On December 31, 1976, Superior made its initial transfer to the escrow trust fund in the amount of $620,000, composed of a corporate savings account of $150,000 and funds from a general corporate account of $470,000. Superior intended that the $620,000 deposit cover 100 percent of its $544,828 in estimated liability for third-party claims outstanding as of December 31, 1976. Of the $544,828, Superior had decided to contest the existence or amount of its legal liability in the sum of $326,574.

Superior adopted a procedure for payment of third parties' claims by means of the drawing of a "safety draft" on general corporate funds. In accordance with this procedure, when Superior determined that a claimant should be paid, it issued the safety draft to the claimant who, in turn, endorsed the reverse side of the draft prior to cashing it or depositing it into his bank. In accordance with normal banking procedures, the cashing bank returned this safety draft to Superior's bank, the First National Bank of Atlanta. Then Superior's bank submitted the draft to Superior for approval before transmitting the funds to the cashing bank. Superior had 1 day to approve the fund transfer. Superior approved the cash transfer if the claimant had endorsed the draft so as to relieve Superior of any potential future liabilities which might arise from the prior accident. Once the endorsement was determined as proper for Superior's purposes, Superior returned the draft to its bank instructing the bank to remit the funds to the claimant. The bank then deducted the appropriate amount from Superior's general corporate account. If the claimant's endorsement on the safety draft had not been proper for Superior's purposes—an eventuality which did not occur within the taxable year in issue—Superior would have returned the safety draft to its bank for treatment as a bad check. In that event, Superior's bank would not have remitted any funds to the cashing bank.

All claims outstanding on December 31, 1976, and paid after that date were paid according to this safety draft procedure. Total and final payments on all claims (contested and noncontested) covered by the $544,828 on deposit in the escrow trust

fund on December 31, 1976, eventually amounted to $464,680. These final payments were made on various dates during calendar years 1977 through 1980.

On its consolidated income tax return for calendar year 1976, petitioner claimed a deduction for contested cargo damage, personal liability, and property damage claims arising from accidents involving Superior which amounted to $326,574.

In his statutory notice of deficiency, respondent disallowed petitioner's claimed deductions with the explanation that—

(a) The amount of $1,221,886.00 claimed as cost of operations— insurance by Superior Trucking Company is not allowable to the extent of $326,574.00 to you, an accrual basis taxpayer, since not all the events have occurred which determine the fact of the liability and the amount thereof cannot be determined with reasonable accuracy in accordance with section 1.461–1(a)(2) [sic] of the Income Tax Regulations. Moreover, with respect to contested claims against you, you have not adhered to all the requirements set forth in section 1.461–2 of the Income Tax Regulations. Accordingly, income for the tax year ended December 31, 1976 is increased by $326,574.00.

## OPINION

At the trial of this case, the parties agreed that the only issue for decision is whether the money transferred on December 31, 1976, by Superior to the bank-managed escrow trust fund, constituted transfers of "money or other property to provide for the satisfaction of the asserted liability" within the meaning of section 461(f)(2).

Under the general rule of income tax accounting, an accrual basis taxpayer may deduct a potential expense only in "the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Sec. 1.461–1(a)(2), Income Tax Regs. The parties agree that if this general rule applies, rather than the statutory exception of section 461(f), petitioner is not entitled to the claimed deduction in taxable year 1976. However, the parties agree that if petitioner has satisfied the requirements of section 461(f), then it is entitled to the claimed deduction in calendar year 1976.

In 1964, Congress enacted section 461(f), which, in limited circumstances, permits cash and accrual basis taxpayers to deduct, in the year of transmittal, those qualified transfers of

money or other property intended to provide ultimately for the satisfaction of contested liabilities. As stated by Congress, an objective in enacting section 461(f) was to enable the taxpayer to more "realistically and practically match receipts and disbursements attributable to specific taxable years"[3] than if the taxpayer utilized the general income tax accounting rule.

In pertinent part, section 461(f) provides:

SEC. 461(f). CONTESTED LIABILITIES.—If—

(1) the taxpayer contests an asserted liability,

(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,

(3) the contest with respect to the asserted liability exists after the time of the transfer, and

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year),

then the deduction shall be allowed for the taxable year of the transfer. * * *

For purposes of this case, the parties agree that the requirements of subsections (1), (3), and (4) have been satisfied; the dispute arises with regard to subsection (2).

Respondent takes the position that petitioner is not entitled to the claimed deduction because petitioner did not "provide for the satisfaction of an asserted liability by transferring money * * * beyond his control * * * to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money * * * be delivered in accordance with the settlement of the contest" as required by section 1.461–2(c)(1), Income Tax Regs. Specifically, respondent contends that the funds that petitioner placed in the escrow trust fund had not been transferred beyond its control because (1) the third-party claimant was not a party to the written escrow agreement and the escrow trust fund is a secret fund, and (2) petitioner never intended nor did it utilize the escrowed funds for payment of the outstanding claims.

On the other hand, petitioner strongly argues that the escrow funds were beyond its control and cites numerous supporting factors for this contention. Petitioner also asserts

---

[3]S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 505, 604.

the invalidity of that requirement of section 1.461–2(c)(1)(ii), Income Tax Regs., which specifies that the "person who is asserting the liability" must be a party to the escrow agreement.[4]

It is clear from the legislative history of section 461(f) that one touchstone for qualification under section 461(f) is the taxpayer's loss of control over the assets earmarked for satisfaction of the asserted liabilities. In Senate Supplemental Report 830 (Part 2), 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 700, 746, Congress specified that—

A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property to the person who is asserting the liability, or by a transfer to an escrow agent provided that the money or other property is beyond the control of the taxpayer. However, purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, or a transfer to an account which is within the control of the taxpayer is not a transfer to provide for the satisfaction of an asserted liability.[5]

A determination of whether Superior had transferred the funds beyond its control when it placed the money in the escrow trust fund must be based upon not only the intent of Superior to effectuate such a transfer but also upon whether in fact Superior achieved that goal. To resolve this issue, we must evaluate the loss fund agreement in effect during 1976 and the

---

[4]Sec. 1.461–2(c)(1), Income Tax Regs., provides:

(c) *Transfer to provide for the satisfaction of an asserted liability*—(1) *In general.* A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest, or (iii) to an escrowee or trustee pursuant to an order of the United States, any State or political subdivision thereof, or any agency or instrumentality of the foregoing, or a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest. Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.

[5]A portion of the language of sec. 1.461–2(c)(1), Income Tax Regs., directly parallels the language of the Senate Supplemental Report 830. See note 4 *supra*.

procedures utilized by Superior in carrying out the provisions of the loss fund agreement.

We previously addressed the "control test" issue in a Court-reviewed case, *Poirier & McLane Corp. v. Commissioner*, 63 T.C. 570 (1975), revd. 547 F.2d 161 (2d Cir. 1976). In that case, third parties filed civil suits against the taxpayer for damages allegedly incurred as a result of alleged trespass and negligence committed by the taxpayer's employees while working on two construction jobs. The taxpayer contested the claims, but on December 31, 1964, transferred $1,100,000 in trust for the payment of the obligations on the pending claims. The taxpayer claimed a deduction for the $1,100,000 on its 1964 income tax return. The majority of this Court held that the transfer of the funds to the trust constituted a transfer of moneys beyond the control of the taxpayer in accordance with section 461(f). The Court stated several reasons for its conclusion that the taxpayer satisfied the "control test." Pursuant to the trust instrument, the trustee was authorized to disburse the entrusted funds *only* for the purpose of payment of named third-party claimants. The taxpayer's sole influence over the usage of the funds was to request the trustee to draw a check in the name of a particular claimant. Otherwise, the taxpayer retained no right to control any portion of the trust funds nor to revoke the trust; it merely was a contingent remainderman entitled to those moneys remaining after disposition of all claims.[6]

---

[6]The dissenting opinion in the Tax Court case was not predicated upon the "control test"; rather, it addressed the issue of whether the transfer was to a secret trust and therefore did not meet the literal requirements of sec. 1.461–2(c)(1), Income Tax Regs. In reliance on the secret trust analysis, the Second Circuit reversed the Tax Court decision. Writing for the majority of the Circuit Court, Chief Judge Kaufman indicated that the secret trust analysis is separate and apart from an analysis of whether a transfer of assets to a trust achieved the status of being beyond the taxpayer's control. Chief Judge Kaufman stated:

"Our dissenting brother [Judge Mansfield], in effect, arrives at the opposite conclusion by announcing that 'the important condition precedent' in determining if a payment is deductible under sec. 461(f) is whether the transfer is made 'beyond the taxpayer's control.' But this overlooks the key consideration that the timing and amount of such transfers may still be entirely within the discretion of the taxpayer, as they were in this case. We do not believe a transfer effectuates the statutory purpose to 'realistically match receipts and disbursements for specific taxable years,' merely because the funds are placed beyond the taxpayer's immediate control. * * * [*Poirier & McLane Corp. v. Commissioner*, 547 F.2d 161, 165 (2d Cir. 1976), revg. 63 T.C. 570 (1975).]"

In contrast to the *Poirier & McLane Corp.* case, here the terms of the September 1, 1976, loss fund agreement[7] were not as strongly limiting to Superior's authority to influence the escrowed funds. Under that agreement, Superior was to fund an escrow trust fund to be used "to guarantee payment of all liability which may be incurred by the Policyholder for which the Insurance Company may be responsible under the terms of an insurance policy or policies." The loss fund agreement also stated that the funds would be—

held in reserve for the payment of claims not reported to the Insurance Company [those claims in amounts less than or equal to the insurance policy deductible, which prior to September 1, 1976, was $25,000 and after September 1, 1976, was $50,000] so as to guarantee the payment of said claim or claims to any person, organization or corporation, who, or which, might perfect such claims against the Policyholder or Insurance Company; * * *

In that same vein, the parties agreed—

that said Escrow Trust Fund is to be held in trust for the protection of third-party claimants, for the protection of the Insurance Company, and for the payment of claims soon as they are perfected against or settled by the Policyholder; * * *

Nothing in the loss fund agreement stipulated that the bank would make payments from the escrow trust fund directly to the third-party claimants in satisfaction of their claims. The provision of the September 1973 loss fund agreement which specified that Superior was without authority to withdraw any securities from the escrow trust fund absent the written agreement of Excalibur, was deleted from the September 1, 1976, loss fund agreement. The September 1, 1976, agreement specifically provided not only for additions to, but withdrawals from, the escrow trust fund as long as Superior maintained a sufficient balance to cover 100 percent of all reserves for those claims for which it was liable under the insurance contract. Excalibur had the right of inspection of petitioner's files to

Therefore, it is clear that the "control test" issue raised by the parties in the instant case is an issue apart from the secret trust issue raised by respondent and must be addressed separately.

[7]Both parties agree that it is the 1976 agreement and not the 1973 agreement which controls the outcome of this case.

Since no deposits were ever made under the 1973 agreement, no valid escrow ever existed under that agreement. See *Fulton Land Co. v. Armour Insulating Co.*, 155 S.2d 848 (Ga. 1941); *Lummus Supply Co. v. Fidelity Federal Savings & Loan Assn.*, 234 S.E.2d 671 (Ga. App. 1977).

determine whether the amounts assigned to reserves were adequate. Nevertheless, initially Superior determined the reserves to decide whether a payment should be made to the fund or a withdrawal made therefrom. Based on its determination, alone, Superior could make withdrawals from the fund.

Certainly, the provisions of the 1976 loss fund agreement indicate an intention on the part of Superior to set aside funds sufficient to cover those claims for which Superior potentially would be responsible by reason of the deductible provision in the insurance policy. It is not the *existing* permissive or restrictive language of the loss fund agreement that would cause Superior to run afoul of the "control test." Instead, it is the *absence* of certain restrictions that presents difficulties in the face of the "control test." For example, the loss fund agreement fails to prohibit Superior from withdrawing securities from the escrow trust fund without a cosignature. This absence of qualifying language avails Superior of opportunities to obtain access to or control over the escrowed funds. Another failure on the part of the loss fund agreement is the absence of a specific provision authorizing the bank's disposition of the funds to claimants in settlement or satisfaction of their claims. Pursuant to the language present in the loss fund agreement, the bank would be forced to look to Superior and Excalibur for instruction, and this tie would assure Superior of some continued control over the funds.[8]

Pursuant to section 1.461–2(c)(1), Income Tax Regs., a "taxpayer must relinquish all authority" over the transferred funds in order for the funds to be considered as transferred beyond his control. An analysis of the loss fund agreement indicates that Superior retained several elements of control. When viewed cumulatively, these control elements cause the funds not to be transferred beyond petitioner's control for purposes of section 461(f), and section 1.461–2(c)(1), Income Tax Regs.

The actual procedures and operations employed by Superior reinforce our conclusion that Superior failed to transfer the

---

[8]Under Georgia law, a valid escrow arrangement exists only where absolute control to withdraw the deposited funds or property has passed from the depositor to the escrow agent. Respondent did not argue that the escrow trust fund was not a valid escrow arrangement under Georgia law, and we need not make this determination. Regardless of the impact under Georgia law of the absence of definitive instructions to the bank as to the appropriate disposition of the funds, we must consider its impact under the Federal tax laws.

funds beyond its control. Pursuant to Superior's operations, each month subsequent to the initial December 31, 1976, deposit of $620,000, Superior reevaluated its potential liability exposure by taking into consideration new claims and suits filed against it as opposed to settlements and final decisions by adjudication on outstanding claims. These monthly determinations enabled Superior, without the consent of Excalibur or any other party, to request from the bank the return of any funds which Superior deemed in excess of the balance of its estimated liabilities arising from claims involving cargo, property, and bodily injury. The evidence in the record indicates that in 1977, on Superior's request alone, the bank transferred $244,000 from the escrow trust fund into the general commercial account of Superior.

In sum, because our analysis of the loss fund agreement and the practical operation of the escrow trust fund has led us to the conclusion that the cash which Superior placed in the escrow trust fund on December 31, 1976, was not transferred beyond its control, Superior is not entitled to the benefit of section 461(f).

Both parties address the applicability of *Consolidated Freightways v. Commissioner*, 74 T.C. 768 (1980), to the "control test" issue. A thorough reading of our opinion reveals that the issue in that case concerned whether there was a proper "transfer" within the meaning of section 461(f). The "control test" issue had been conceded. *Consolidated Freightways v. Commissioner, supra* at 803. However, our holding in the *Consolidated Freightways* case supports a conclusion that Superior has not met the requirements of section 461(f). We concluded in the *Consolidated Freightways* case that deposits of 100 percent of reserves for claims, made by a self–insurer with its surety company, were not deductible under section 461(f). The basis of our conclusion was that the deposits were made for the purpose of protecting the surety company in order to induce it to file the bond which the taxpayer was required to have in order to operate as a public carrier.

In our view, the purpose of the escrow in this case was to protect Excalibur, which reported to the various States in which Superior operated that it was fully liable for the amount of all claims for which Superior was liable. It was only by

agreement between Excalibur and Superior that Superior was effectively a self–insurer as to the $50,000 deductible. In spite of the recitation in the loss fund agreement, the bank never paid any claims out of the escrow fund nor was it intended that it would. If Superior had failed to pay, the claimant, being aware of the insurance obligation of Excalibur because of its public filing guaranteeing claims owed by Superior, would turn to Excalibur. There is nothing to indicate that any entity other than petitioner, Excalibur, and the bank knew of the loss fund agreement. Certainly Excalibur would be protected by the fund if the insurance company had to pay a claim properly due by Superior under the deductible agreement. However, this protection is comparable to the protection of the surety company in the *Consolidated Freightways* case.

The parties have raised several other issues, one of which is whether section 1.461–2(c)(1), Income Tax Regs., is valid in that it requires a written escrow agreement "among the escrowee or trustee, the taxpayer, and the person who is asserting the liability." We need not address these issues since Superior has failed to meet the "control test" and also has failed to show that the deposits were to provide for payments to the claimants. In this case, we in no way modify our position on the validity of section 1.461–2(c)(1), Income Tax Regs., as expressed in *Poirier & McLane Corp. v. Commissioner, supra,* and *Consolidated Freightways v. Commissioner, supra.*

*Decision will be entered for the respondent.*