**CONSOLIDATED FREIGHTWAYS, INC., and Affiliates, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant,**

v.

**CONSOLIDATED FREIGHTWAYS, INC., and Affiliates, Petitioners-Appellees.**

Nos. 82–7366, 82–7426.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 18, 1983.

Decided June 17, 1983.

James E. Merritt, Washington, D.C., for Consolidated Freightways.

William A. Whitledge, Washington, D.C., for C.I.R.

Before CHOY and SNEED, Circuit Judges, and RAFEEDIE *, District Judge.

SNEED, Circuit Judge:

This case involves two principal issues. The first is whether appellant Consolidated Freightways' truck loading docks qualify for an investment tax credit. Related to that issue is whether the lighting fixtures and overhead doors in the loading docks are structural components, and therefore ineligible for the investment tax credit. The second principal issue is whether certain deposits with a surety are deductible under section 461(f) of the Internal Revenue Code of 1954.

The Tax Court held the loading docks did not qualify for the tax credit, but allowed credit for the lighting fixtures and overhead doors. The Tax Court also held that the taxpayer's deposits with the surety were not deductible under section 461(f) as money transferred to provide for the satisfaction of a contested liability. 74 T.C. 768 (1980). We affirm the Tax Court's denial of the tax credit for the loading docks and of the section 461(f) deduction. We reverse the Tax Court's grant of a tax credit for the lighting fixtures and overhead doors.

I.

THE INVESTMENT TAX CREDIT
CLAIM

A. *Truck Loading Docks*

Consolidated Freightways claimed an investment tax credit for the construction of truck loading docks on its income tax returns for 1966–1970.[1] The Commissioner disallowed the claim under section 48 of the

---

* Honorable Edward Rafeedie, United States District Judge for the Central District of California, sitting by designation.

1. The loading docks are raised concrete platforms designed to permit freight to be rolled directly from the inside of a truck trailer onto or across the dock, and into another trailer. All of the docks have a metal roof supported by metal beams, with trailer bays located around the perimeters of each dock. Most of the docks have overhead doors at each trailer position which may be rolled down and closed when the position or dock is not in operation. Several of the docks are equipped with a towveyer conveyer system to assist in the movement of freight across the docks. For a detailed description of the loading docks, *see* 74 T.C. at 770–81.

Internal Revenue Code, which provides that "a building and its structural components" are not property eligible for an investment tax credit, and the Tax Court rejected Consolidated's suit for redetermination of deficiencies. Consolidated in this appeal argues, first, that the Tax Court failed to apply the proper test for deciding whether the loading docks are buildings, and, second, that an application of the proper test would establish that the loading docks are not buildings, and are therefore eligible for the investment tax credit. We disagree.

Treasury Regulation § 1.48–1(e)(1) states that:

> The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores.[2]

In interpreting this Regulation, courts have used two tests to decide whether a structure is a building: (1) the "appearance test"—does the structure look like a building; and (2) the "functional test"—does the structure function like a building.

### 1. Appearance Test

The Tax Court held that the functional test is the primary means of determining whether a structure is a building. It did not reach the appearance test, except in a footnote. 74 T.C. at 794–95, 796 n. 11. Consolidated argues that the Tax Court erred in failing to apply the appearance test, and that the appearance test would establish that the docks are not buildings because they lack permanent walls. Consolidated is mistaken.

In *Thirup v. Commissioner,* 508 F.2d 915, 919 (9th Cir.1974), we stated that we "thoroughly agree ... [with the] recent authorities ... [who have] abandon[ed] the appearance test," and we employed the functional test and held that greenhouses are not buildings. *See Brown-Forman Distillers Corp. v. United States,* 499 F.2d 1263, 1271 (Ct.Cl.1974) ("the real inquiry is whether [the structures] are functioning or being used as 'buildings'"); *Satrum v. Commissioner,* 62 T.C. 413, 416 (1974) (applying only the functional test). *But cf. A.C. Monk & Co. v. United States,* 686 F.2d 1058, 1061 (4th Cir.1982); (placing major emphasis on functional test, but still looking to appearance); *Consolidated Freightways, Inc. v. United States,* 620 F.2d 862, 870, 223 Ct.Cl. 443 (Ct.Cl.1980) (same). Thus, the Tax Court's failure to employ the functional test is consistent with our approach in *Thirup.*

Consolidated contends, however, that the Tax Court was the first court to hold that a structure that does not look like

---

**2.** Treas.Reg. § 1.48–1(e)(1) provides in full:

Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

a building is nonetheless a building for investment tax credit purposes. *Consolidated* is wrong. The docks appear to be buildings, as the Tax Court said at 74 T.C. at 796 n. 11. The photographs of the docks confirm this. The docks, although they lack normal walls, are mostly enclosed by overhead doors. Consolidated insists that the docks cannot be buildings because buildings must have permanent walls. This argument was advanced—and rejected—in both *A.C. Monk,* 686 F.2d at 1063, and *Consolidated Freightways,* 620 F.2d at 870 & n. 17, and in *Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 796 & n. 9 (8th Cir. 1976). We agree with these courts that, for the purposes of the investment tax credit, a structure without permanent walls may constitute a building.

### 2. *Functional Test*

■ To apply the functional test we must determine whether the structure functions like a building—does it "provide shelter ... or furnish working [or] office ... space, or exist for another purpose that could be listed with the enumerated purposes without violating the constraining rules of *ejusdem generis.*" *Thirup,* 508 F.2d at 919. If it functions as a building because, for example, it furnishes working space to employees, it is then necessary to consider the relationship between the "nature" of the employee activities inside the structure and the structure's primary function: does it "provide working space for employees that is more than merely incidental to the principal function or use of the structure"? *Id.*[3]

The Tax Court held that, in looking at the " 'nature' of human activity" in the structure, "an important, but not the sole, point of inquiry is the quantity and quality of human activity in the structure." *Id.* It then found that "a substantial purpose of the docks is to provide a working space in which the dockworkers can efficiently move freight," and that the "purpose of the

dock[s] is far more than 'incidentally' to provide working space for employees ... [since h]uman activities *inside* the docks were essential to the function of the docks." *Id.* at 795–96 (emphasis in original). Therefore, the docks were "buildings."

Consolidated contends that the Tax Court erred in looking at the quantity of human activity in the docks, and in incorporating that criterion into its findings. It also asserts that the Tax Court failed to apply, and make findings on, the "proper" *Thirup* tests, which Consolidated claims are: (1) whether the docks are "specialized structures whose utility is principally and primarily a significantly contributive factor in the actual manufacturing or production of the product itself," *Thirup,* 508 F.2d at 919; and (2) whether the docks are "specialized structure[s] not reasonably adaptable to other possible uses," *A.C. Monk,* 686 F.2d at 1061. We shall address each of these contentions.

It is true that the *Thirup* court found "unpersuasive" the distinction between buildings and other structures based on the amount of human activity in the structures. 508 F.2d at 919. The Tax Court, however, did not rely solely on that criterion. As *Thirup* requires, the Tax Court looked at the purpose of the loading docks to see whether the function of providing shelter was "more than merely incidental" to that purpose. This requires an examination of the quantity of human activity in the docks. However, the Tax Court did not make the "amount of human activity" the controlling criterion. It merely helped the court to determine that human activity was more than merely incidental to the function of the docks. The Tax Court's finding that a substantial purpose of the docks was to provide working space was a response to the "more than merely incidental" test employed by the Court of Claims in *Consolidated Freightways,* 620 F.2d at 872–73. There the court said: "[I]n determining whether the structure provides working

---

**3.** Another way of looking at this inquiry is to see whether the employee activity is "merely supportive of, and ancillary to" the principal function and use of the structure. *Thirup,* 508 F.2d at 919 (quoting from *Satrum,* 62 T.C. at 417).

space for employees *which is more than merely incidental to the principal function or use of the structure,* we must examine the frequency of the human activity in the structure, how essential such activity is to the basic process or use involved and how substantial that activity is." (Emphasis added). Nothing there is inconsistent with *Thirup.*

Second, Consolidated errs when it assumes that the *Thirup* court intended that its "significantly contributive factor to the actual manufacturing or production" language alter or amend the functional test. The court was referring to a passage in Treas.Reg. § 1.48–1(e)(1)—subsections (i) and (ii)—which qualifies for the tax credit those structures which are essentially equipment; or which are an integral part of the manufacturing process such as a blast furnace. The Tax Court considered, and properly rejected, Consolidated's claim that the loading docks fell within either of these categories. 74 T.C. at 796–97.

Third, while we did not specifically use the "structure not reasonably adaptable to other possible uses" test in *Thirup,* we did cite to *Brown-Forman Distillers,* 499 F.2d at 1271, which applied that test. In *Thirup* the greenhouses were essentially equipment, or part of the manufacturing process. Without them, the taxpayer's plants would not have grown. In contrast, here the loading docks, the purpose of which is to move freight, accomplishes that end by helping Consolidated's employees to transfer freight and by providing them with working space and shelter. The dock could be used for other purposes.[4] The "reasonably adaptable" test does not mean that "specialized structures" cannot be classified as buildings.[5] Bus stations, airline terminals, or hotels—all specialized structures—are nonetheless buildings.

Finally, as noted above, three courts have found that loading docks are buildings. While none of the courts followed the *Thirup* functional test exactly, the analysis of the *A.C. Monk* court, and, to a lesser extent, that of *Consolidated Freightways,* is close to *Thirup.* Thus *Thirup* does not require that we reach a different result.

**B. The Overhead Doors and Lighting Fixtures**

Section 48 of the Internal Revenue Code removes from eligibility for an investment tax credit "structural components" of a building. Treas.Reg. § 1.48–1(e)(2) includes within the term "structural components" "windows and doors," as well as "electric wiring and lighting fixtures."[6] Thus, the overhead doors and lighting fixtures in Consolidated's loading docks are structural components, according to a literal reading of the Regulation.

---

4. Consolidated's expert witness admitted that the loading docks could be adapted to other uses. R.T. at 351.

5. It should also be noted that the *A.C. Monk* court considered whether railroad loading docks are "reasonably adaptable," and held that they are buildings. 686 F.2d at 1061, 1063 & n. 4.

6. Treas.Reg. § 1.48–1(e)(2) provides:

(2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts, plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components."

The Tax Court, however, held that the overhead doors and lighting fixtures were "temporary attachments to the docks and are clearly not structural components thereof." 74 T.C. at 798. Not reasonably permanent components have been held to be eligible for the credit. *See, e.g., King Radio Corp. v. United States,* 486 F.2d 1091 (10th Cir.1973) (movable room partitions are not structural components); *Minot Federal Savings & Loan Association v. United States,* 435 F.2d 1368 (8th Cir.1970) (same). The Commissioner concedes that such authority exists, but objects to the Tax Court's definition of "permanency," and contends that there is no need to depart from a literal reading of the Regulation in this case.

According to the Tax Court, a structural component is an item which "is an integral and permanent part of the structure, the removal of which will affect the essential structure of the building." 74 T.C. at 797. An item which "can be easily and quickly removed" is not a structural component. *Id.* at 798. The fact that it would have been had it not been removable easily is immaterial. The Tax Court noted that the overhead doors and lights could be removed quickly, in a few hours and a few minutes respectively.

We hold that the Commissioner has the better of the argument in this case. Admittedly a rule that turns on the ease of removal has an appeal. It appears to focus on a condition that is easily demonstrable. This appearance is deceiving, however. For example, paneling, tiling, doors, plumbing fixtures, lighting fixtures, and fire escapes—all listed as examples of structural components in the Regulation—can often be removed, or easily made removable, without affecting the essential structure of a building. Given certain assumptions with respect to design, their removal could probably be accomplished in less time than it would take Consolidated to dismantle an overhead door. *See Kramertown Co. v. Commissioner,* 488 F.2d 728, 731 (5th Cir. 1974) (ease of removal of rooftop air conditioner does not justify departure from Regulation).

■ We prefer in this case to adhere to the literal language of the Regulation, which is based directly on the House and Senate Reports on the Revenue Act of 1962. *See King Radio,* 486 F.2d at 1094–95. In determining when an item functioning as a structural component should be excepted from the Regulation because it is not reasonably permanent, we look at a variety of factors, including, where possible, the function and design of the component at issue, the intent of the taxpayer in installing the component, and the effect of removal of the component on the building.[7] An examination of these factors in this case indicates that both the overhead doors and lighting fixtures function as an integral part of the loading docks, and were designed to be used as permanent features of the docks. However, removal of the overhead doors and lighting fixtures would detract significantly from the usefulness of the docks in Consolidated's operations. We therefore hold that the overhead doors and lighting fixtures are structural components, and thus not eligible for an investment tax credit.

---

7. An inquiry might include the following questions:

    (1) Is the property capable of being moved, and has it in fact been moved? . . . (2) Is the property designed or constructed to remain permanently in place? . . . (3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? . . . (4) How substantial a job is removal of the property and how time-consuming is it? . . . (5) How much damage will the property sustain upon its removal? . . .

*Whiteco Industries, Inc. v. Commissioner,* 65 T.C. 664, 672–73 (1975) (outdoor advertising signs qualify for investment tax credit). *Accord Standard Oil Co. (Indiana) v. Commissioner,* 77 T.C. 349, 407–08 (1981); *Kimmelman v. Commissioner,* 72 T.C. 294, 308 (1979). *Cf. Southland Corp. v. United States,* 611 F.2d 348, 350, 222 Ct.Cl. 22 (Ct.Cl.1979) (following a set of factors which are similar to those in *Whiteco,* but which do not apply in the present case).

## II.

### THE SECTION 461(f) CLAIM

A. *The Consolidated-Seaboard Agreement*

In 1961, Consolidated became a self-insurer. To satisfy state and Interstate Commerce Commission requirements that self-insured motor carriers be able to provide coverage for personal injury and property damage caused by the operation of their motor vehicles, Consolidated entered into a contract with Seaboard Surety Co. to have financial responsibility bonds filed with the appropriate regulatory agencies. In addition to paying Seaboard a premium for filing the bonds, Consolidated was required by the contract and a collateral agreement to deposit with Seaboard an amount equal to Consolidated's estimated liability for each accident covered by the bonds, up to the limits of Seaboard's potential liability.

The amount of Consolidated's deposit with Seaboard was adjusted periodically. When the estimated liabilities of Consolidated exceeded the amount on deposit, it would increase the deposit with Seaboard. Also, when the deposit became greater than the estimated liabilities, Consolidated would, at irregular intervals, request a refund to reduce the amount on deposit. After a claim was settled, Consolidated would satisfy the claim by a payment directly to the claimant, and the amount of Consolidated's estimated liabilities would be reduced. No refund invariably followed the satisfaction of a claim, however.

Relying on section 461(f) of the Internal Revenue Code, Consolidated claimed deductions on its 1966–1970 federal income tax returns for the amounts deposited with Seaboard, and reported as income all refunds of deposits made to it by Seaboard.[8] Section 461(f) permits a deduction in the year payment is made to satisfy a contested liability if, *inter alia*, "the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability." Treasury Regulation § 1.461–2(c)(1) explains that to qualify for a section 461(f) deduction, payment may be made to the person asserting the liability or "to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest . . . ."[9]

The Commissioner disallowed the deductions for the deposits with Seaboard, and removed from income the refunds from Seaboard to Consolidated. The Tax Court sustained that determination. It held that the surety arrangement with Seaboard did not meet the requirements of the Regulation. The Tax Court found that neither Consolidated nor Seaboard intended that the amounts deposited with Seaboard be used to pay claimants against Consolidated. 74 T.C. at 804. Instead, the Tax Court found that deposits were made solely to secure Consolidated's obligation to reimburse Seaboard for any claims that, con-

8. Consolidated also claimed a deduction for the payment of the claims themselves.

9. Treas.Reg. § 1.461–2(c)(1) provides in full:
   (c) Transfer to provide for the satisfaction of an asserted liability—(1) In general. A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest, or (iii) to an escrowee or trustee pursuant to an order of the United States, any State or political subdivision thereof, or any agency or instrumentality of

the foregoing, or a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest. Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.

trary to the expectations of both, Seaboard might be required to pay under the bonds, and that, in fact, on no occasion did Seaboard make a payment to a claimant on behalf of Consolidated. The Tax Court concluded that since the deposits "were made to provide for Seaboard's security and *not* 'to provide for the satisfaction of the asserted liability,' as is required by section 461(f)(2), they are not deductible under section 461(f)." [10]  *Id.* (emphasis in original).

B. *Deductibility of Deposits Made to a Surety*

Consolidated asserts that the Tax Court's holding in this case must be reversed because it is inconsistent with our intervening decision in *Chem Aero, Inc. v. United States,* 694 F.2d 196 (9th Cir.1982), in two principal respects. First, Consolidated argues that section 461(f) does not require that a claimant against Consolidated be paid with the "same dollars" that were deposited with Seaboard for a deduction to be allowed. Second, Consolidated contends that the "purpose and intent" of its surety arrangement with Seaboard is irrelevant to whether the deposits are deductible, and that the transfers to Seaboard did provide for the satisfaction of the liabilities asserted against Consolidated. We discuss each argument in turn.

1. *"Same Dollars" Argument*

Perhaps some reference to familiar landmarks will be useful. An accrual basis taxpayer normally may only deduct an expense in "the taxable year in which all events have occurred which determine the fact of the liability and the amount thereof . . . ." Treas.Reg. § 1.146–1(a)(2). But where a liability is contested, neither the fact nor the amount of the liability can be determined with sufficient accuracy for the liability to be deducted. *See Poirier & McLane Corp. v. Commissioner,* 547 F.2d 161, 164 (2d Cir.1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977). In *United States v. Consolidated Edison,* 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961), the Supreme Court eliminated an exception to the "all events" rule, which allowed an accrual basis taxpayer to deduct the payment of a contested tax liability in the year that the payment was made.

In reaction to *Consolidated Edison,* Congress, as part of the Revenue Act of 1964, added section 461(f) to the Internal Revenue Code. That section allows an accrual method taxpayer to deduct in the year of payment the transfer of "money or other property to provide for the satisfaction" of any contested liability where, "but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer . . . ." [11]  The purpose of section 461(f) is to match, in a realistic manner, receipts and disbursements in the taxable year in which revenues were received and payments were actually made. S.Rep. No. 830, 88th Cong., 2d Sess. 100, *reprinted in* 1964 U.S.Code Cong. & Admin.News 1673, 1773.

We applied section 461(f) in *Chem Aero.* There, a sales agent brought a successful action against the taxpayer for unpaid com-

---

10. The Tax Court also held that the deductions did not satisfy Treas.Reg. § 1.146–2(c)(1) because the payments to Seaboard were not made pursuant to a written agreement that the deposits with Seaboard be delivered in accordance with the outcome of the litigation, and because the Consolidated-Seaboard agreement did not create a trust or escrow relationship, as, according to the Tax Court, the Regulation demands. 74 T.C. at 805. Consolidated argues that *Chem Aero, Inc. v. United States,* 694 F.2d 196 (9th Cir.1982), compels reversal of these holdings. We do not, however, have to reach these issues, since we uphold the Commissioner's denial of Consolidated's section 461(f) deduction on other grounds.

11. Section 461(f) of the Internal Revenue Code provides for the deduction by a taxpayer of an amount transferred to satisfy a contested liability in the tax year of the transfer if the following four conditions are met: "(1) the taxpayer contests an asserted liability, (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability, (3) the contest with respect to the asserted liability exists after the time of the transfer, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year)." *See Chem Aero, Inc. v. United States,* 694 F.2d 196, 198 (9th Cir.1982).

missions, and the taxpayer, in compliance with state law, posted a bond collateralized by an irrevocable letter of credit, which, in turn, was backed by a certificate of deposit, to cover the amount of the judgment while the award was appealed. When the taxpayer lost its appeal, the issuer of the bond delivered the letter of credit to the taxpayer's bank, drew out the amount of the judgment plus interest, charged the withdrawal against the certificate of deposit, and paid off the claimant. We permitted the taxpayer to take a section 461(f) deduction for the amount of the contested liability in the year that the bond was collateralized, holding that the legislative purpose of section 461(f) "can be fulfilled by allowing the taxpayer to take the deduction whenever the money for the settlement of the contested liability is irrevocably parted with, provided that the manner of transfer is not open to the possibility of tax abuse." 694 F.2d at 200. *See also Poirier & McLane Corp.*, 547 F.2d at 165–66; *In re I.J. Knight Realty Corp.*, 431 F.Supp. 946, 954 (E.D.Pa.1977).

In *Chem Aero,* we were aware of the Tax Court decision here being reviewed. We distinguished that decision by pointing out that the moneys deposited with Seaboard by the taxpayer, Consolidated, "were never used to pay claims; the actual payments came directly from Consolidated Freightways." 694 F.2d at 199 n. 4. In *Chem Aero,* on the other hand, "the funds (in the form of a certificate of deposit) that Chem Aero pledged to the bank to secure the bond were the *only* funds that Chem Aero had available for the satisfaction of the judgment, and ... were *necessarily* used for that purpose." *Id.* (emphasis added).

The question therefore arises whether this so-called "same money" distinction is required by section 461(f). Consolidated argues that there is no "same money" requirement because (1) the legislative history of section 461(f) is silent on the point, and because (2) Consolidated's agreement with Seaboard provides for adjustment of the moneys deposited with the surety, so that the result of the arrangement is as if the same dollars were paid out. We disagree.

First, while the legislative history does not specifically impose a "same money" requirement on a section 461(f) deduction, it is noteworthy that *Chem Aero* and the cases and examples of permissible transactions given in the legislative history, *see* S.Rep. No. 830, at 100; *id.* at 239–40 (Supplemental Report), *reprinted in* 1964 U.S. Code Cong. & Admin.News 1773, 1912–13, do involve the transfer of the same money that is eventually paid to the claimant. Moreover, the Supplemental Senate Report mentions three types of transactions which would *not* qualify for a deduction in the year of transfer under section 461(f); in none of these transactions was a claimant paid with "same money" that was set aside against a contested liability. *Id.* at 240, *reprinted in* 1964 U.S.Code Cong. & Admin. News at 1913; *see also* Treas.Reg. § 1.146–2(c)(1). Finally, the legislative history indicates that Congress was concerned lest section 461(f) be used by accrual basis taxpayers to reduce their tax burden by accelerating deductions, instead of matching receipts and expenditures. *See In re I.J. Knight Realty Corp.,* 431 F.Supp. at 954. A "same money" requirement would diminish the possibility of that type of tax abuse.

Consolidated points out, however, that a "same money" requirement would be impractical in its self-insurance plan, where between 350 and 400 claims against Consolidated were outstanding at any one time. It insists that section 461(f) can be satisfied by a scheme such as it employs under which the transferred money is placed out of its control and periodic adjustments to reflect the amount of contested liabilities are made.

■ We are by no means convinced by this argument. However, even if we were, we would find that the plan Consolidated employs does lend itself to impermissible tax abuse. Thus, although we agree that the money transferred by Consolidated was "under the absolute control of Seaboard," 74 T.C. at 788, we could not hold that the plan satisfies section 461(f). Its fatal flaw is that refunds by Seaboard are made only

at irregular intervals.[12] Deposits were required not to be less than estimated liabilities; but refunds were not required when deposits exceeded liabilities. Consolidated's accounts therefore had the potential of not being in balance at the end of the tax year. This would allow Consolidated within a given taxable period to accelerate its deductions and to defer its income without regard to either the total estimated liabilities or the amount of claims settled. This provides an opportunity for tax abuse.

In sum, we hold that while we are not prepared to reject the "same money" requirement, the arrangement between Consolidated and Seaboard does not meet the requirements of section 461(f) even if we were to reject the "same money" requirement.

### 2. *Purpose and Intent Requirement*

A further basis for affirming the denial of Consolidated's section 461(f) deduction is that the purpose of Consolidated's transfers of money to Seaboard under its agreement with Seaboard was to protect Seaboard, not "to provide for the satisfaction of the asserted liability," as section 461(f) demands. Consolidated asserts that it is improper to look at the purpose and intent of the parties. Also it argues that inasmuch as Seaboard was contractually obligated to pay a claimant had Consolidated not done so, the transfers, in effect, were intended to provide for the satisfaction of Consolidated's contested liabilities.[13]

Section 461(f)(2) makes it clear that an examination of the purpose and intent of the taxpayer is necessary to determine whether the requirements for deductibility have been met. For the transfer to be deductible, it must have been made "to provide for the satisfaction of the asserted

liability."[14] Any other reason for the transfer fails to satisfy the statute. *See Specialized Services, Inc. v. Commissioner,* 77 T.C. 490, 506–07 (1981). Moreover, Seaboard's contractual obligation to pay claimants upon Consolidated's default changes nothing. As the Tax Court found, the parties did not intend the transferred money to be used to pay a single claim. 74 T.C. at 804. It was to provide security for Seaboard and not to satisfy Consolidated's contested liabilities.

AFFIRMED IN PART, REVERSED IN PART.

---

12. According to Consolidated's Revised Footnote 39 to its Opening Brief, at 7, it received refunds from Seaboard on July 19, 1967, August 15, 1968, April 4, 1969, and October 20, 1970. .

13. Consolidated contends, in addition to these claims, that the Tax Court erred in its finding of fact on the purpose and intent issue. Our

review of the record indicates that the Tax Court's finding is not clearly erroneous, and we therefore decline to disregard it.

14. As noted above, the taxpayer need not transfer the same money that is eventually used to pay off the claimant to meet the requirements of section 461(f).