MALONE & HYDE, INC., AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Malone & Hyde, Inc. v. Commissioner
Docket No. 5901-85
United States Tax Court
T.C. Memo 1989-604; 1989 Tax Ct. Memo LEXIS 603; 58 T.C.M. (CCH) 631; T.C.M. (RIA) 89604; November 2, 1989
John M. Bixler,Frederick H. Robinson, and Keith D. Lawson, for the petitioner. Vallie C. Brooks, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Fiscal Year Ended
Deficiency
6/24/78
$  50,247.97
6/30/79
766,064.83
6/28/80
949,061.05
After concessions, [1] the issues for decision are: 1) Whether Malone & Hyde, Inc. may deduct as ordinary and necessary business expenses the amounts it paid to Northwestern National Insurance Company as insurance premiums, which were in turn paid by Northwestern National Insurance Company to Malone & Hyde's wholly owned subsidiary, Eastland Insurance, Ltd., as reinsurance premiums. 2) Alternatively, if these amounts paid over to Eastland Insurance, Ltd. are not deductible as insurance premiums, whether the net additions to Eastland's case reserves for reported, uncontested worker's compensation claims may be allowed as *606 deductions. This depends on whether or not the "all events" test for accrual of these expenses has been satisfied. 3) Alternatively, if the amounts paid over to Eastland Insurance, Ltd. are not deductible as insurance premiums, and if the net additions to the case reserves for reported, uncontested worker's compensation claims are not deductible, whether the amounts paid by Eastland to General Adjustment Bureau (GAB) to finance the contested claims in the Loss Impress Fund are deductible. This depends on whether or not the requirements of section 461(f)[2] have been satisfied. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner (Malone & Hyde, Inc., and Subsidiaries) had its principal place of business at 3030 Poplar Avenue, Memphis, Tennessee at the time of the filing of the petition. Malone & Hyde, Inc. *607 (hereinafter referred to as Malone & Hyde) is the common parent of petitioner, an affiliated group of corporations within the meaning of section 1504(a), which filed consolidated Federal income tax returns for each of the taxable years ending June 30, 1978, 1979, and 1980 (hereinafter referred to as fiscal year or FY 1978, 1979, and 1980) with the Internal Revenue Service Center at Memphis, Tennessee. During each of the years involved, Malone & Hyde maintained its books and records on the basis of the accrual method of accounting and used that method for purposes of computing its income for Federal income tax purposes. Malone & Hyde is incorporated under the laws of the State of Tennessee and has been in the wholesale food distribution business since 1907. During each of its fiscal years 1978, 1979, and 1980, Malone & Hyde stock was publicly traded on the New York Stock Exchange. During the years in issue, subsidiaries and divisions of Malone & Hyde operated in the retail food industry, the insurance industry, the financial services industry, the retail drugstore industry, the retail auto parts industry, and the retail sporting goods industry. Malone & Hyde was primarily a wholesale *608 food distributor, distributing all food products and all of the services that its customers (independent retail grocery store owners) needed to compete against the chains. It operated 10 distribution centers, primarily in the southeast, servicing approximately 2,500 independent retail grocers. It also provided its customers the other services mentioned above. Since the early 1960's, Hyde Insurance Agency, Inc., a wholly owned subsidiary of Malone & Hyde, has been in business as an insurance agency, serving purely as a broker to provide Malone & Hyde and its subsidiaries and its customers with insurance written by the various major insurance companies. Hyde Insurance Agency acted as a full-service insurance agency obtaining for its clients all types of insurance coverage, including property, casualty, general liability, auto liability, and worker's compensation. [3] The Hyde Insurance Agency's clients included Malone & Hyde, Malone & Hyde's subsidiaries, Malone & Hyde's wholesale customers who operated independent retail grocery stores, and some third parties unrelated to Malone & Hyde or its subsidiaries or its customers. The Hyde Insurance Agency never wrote any insurance but *609 merely obtained insurance coverage from the various major insurance companies. By the mid-1970's, the Hyde Insurance Agency found that insurance premiums were increasing each year and certain insurance was not obtainable for some of its clients. Its parent corporation, Malone & Hyde, began to investigate other means of obtaining adequate insurance coverages, including creating its own insurance subsidiary. Malone & Hyde was dissatisfied with the premiums it paid to its insurer, CNA, under CNA's "divisor plan." CNA's "divisor plan" was based on a fixed percentage *610 of the amount of paid claims and reserves. Under that "divisor plan," the higher the claims the more CNA was paid, thus resulting in little incentive to control claims costs. As a result, both the Hyde Insurance Agency and Malone & Hyde considered other cheaper cost alternatives in insurance coverage. Since Malone & Hyde's only experience in the insurance business was limited to running an insurance agency, it retained an independent consultant, Risk Management, Inc. (RMI), of Los Angeles, California, to advise it on setting up its own insurance subsidiary. In March 1977, Malone & Hyde executed a written agreement with RMI for the development of a captive insurance program. [4]RMI was in the business of developing and managing such captive insurance programs. The agreement was made with the understanding that Malone & Hyde would enter into a management contract with RMI for the implementation and management of the program developed. RMI prepared a Proposed Insurance Subsidiary Feasibility Report for Malone & Hyde dated May 27, 1977. [5]
*611 RMI recommended a two-phase development plan for entering the insurance business. In phase I, the insurance subsidiary would only insure the risks of Malone & Hyde and its subsidiaries. In phase II, if the insurance subsidiary had proved that it could operate as a financially sound enterprise, Malone & Hyde could decide whether to expand so that third-party risks (Malone & Hyde's customers and unrelated outside parties) would be insured. RMI also recommended that the insurance subsidiary reinsure risks originally placed with another insurance company, rather than to insure risks directly. RMI believed that providing reinsurance was preferable to providing direct insurance because reinsurers need not, as direct insurers must, qualify to conduct business under the insurance laws of each state in which a policy holder resides. RMI further recommended that the company be incorporated outside the United States because the insurance laws of some foreign countries are less restrictive than those of Colorado, the only state that had a captive insurance company statute in 1977. RMI suggested Bermuda as a possible place of incorporation because of the relative simplicity of its insurance *612 regulations. Malone & Hyde adopted RMI's recommendations and decided to create an insurance company subsidiary to reinsure selected risks. Subsequently, Eastland Insurance, Ltd. (hereinafter referred to as Eastland) was incorporated in Bermuda on June 21, 1977, to carry on the business of insurance, reinsurance, and coinsurance. Eastland was authorized to issue 120,000 shares at $ 1 par value. Malone & Hyde purchased all of these shares on June 21, 1977, for $ 120,000. Under Bermuda's insurance law, Eastland was adequately capitalized. On May 10, 1978, Eastland executed a management agreement with RMI's subsidiary, Pinehurst Management Company, Ltd. (hereinafter referred to as Pinehurst Management), effective July 1, 1978, to perform services in Bermuda on behalf of Eastland. Eastland's officers and directors were the same individuals as Malone & Hyde's officers and directors, and were based in Memphis, Tennessee. The board of directors of Eastland determined that the initial activity of the company would include only reinsurance of the risks of Malone & Hyde and its subsidiaries, but that Eastland would investigate avenues of obtaining participation in risks of unrelated *613 entities. The board further determined that Eastland would reinsure only the first $ 150,000 of each claim of worker's compensation, auto liability, and general liability. Malone & Hyde had good historical loss information as to those types of claims, and those were the predictable, less volatile claims. Since Eastland acted only as a reinsurer, Malone & Hyde had to choose an insurer who qualified to sell insurance in each state where Malone & Hyde and its subsidiaries (and later possibly its customers) operated and who would be willing to act as a primary insurer and reinsure the risks with Eastland. Malone & Hyde talked to several insurance companies before deciding upon the company most suitable to function as the primary insurer of risks to be reinsured with Eastland. Northwestern National Insurance Company (hereinafter referred to as Northwestern), a large, highly regarded casualty insurance company in Milwaukee, Wisconsin, became the insurer and Eastland was the reinsurer for those claims. Eastland began reinsuring risks on July 1, 1978, covering only worker's compensation, auto liability, and general liability. In other words, Malone & Hyde and its subsidiaries would *614 insure their risks with Northwestern and Northwestern would reinsure those risks up to $ 150,000 with Eastland. Northwestern could act as either the primary insurer of such risks above $ 150,000 per claim or could reinsure those amounts with other insurance companies. On July 11, 1978, Eastland executed the reinsurance agreement with Northwestern. Under the terms of the reinsurance agreement, Eastland provided to Northwestern an irrevocable letter of credit dated June 23, 1978, in the amount of $ 250,000 to cover any amounts remaining unpaid under the reinsurance agreement, with such drafts on the letter of credit to be presented not later than June 30, 1979. That particular letter of credit was amended on February 4, 1980, to increase the amount of the letter of credit to $ 600,000 effective as of January 1, 1980. Also on July 11, 1978, Malone & Hyde and Northwestern executed a Hold Harmless Agreement. [6] The parties agreed, in consideration for the policies of insurance issued in favor of Malone & Hyde by Northwestern, that Malone & Hyde would not pursue against Northwestern any claim under those policies, and would hold Northwestern harmless and defend Northwestern against *615 any claim under the policies from any third party in the event that Eastland defaulted on its obligations as reinsurer of Northwestern. [7]
During Eastland's fiscal years ending June 30, 1979, and June 30, 1980, a loss reserve was established on Eastland's books for claims which statistically were assumed to have already occurred but which had not been reported (incurred but not reported, or IBNR, reserves). IBNR reserves are established because the insurance industry experience has demonstrated that the ultimate cost of claims for *616 a particular year will exceed the amount in the case reserves. RMI established this IBNR reserve for Eastland based upon the type and extent of the risks Eastland insured, historical development experience, and the frequency and severity of occurrences. The IBNR reserve was adjusted by RMI to reflect actual claims filed and subsequent estimates of IBNR losses. Eastland claimed a deduction in the amount of each increase in the IBNR reserve and took into income the amount of each decrease in the IBNR reserve. The IBNR reserve is not involved in any of the issues in this case. In addition, a loss reserve for reported or filed claims, better known as the case reserve, was also set up on Eastland's books during its fiscal years ending June 30, 1979, and June 30, 1980. When a claim was made against Malone & Hyde, it instructed the claimant to file a claim with the General Adjustment Bureau (GAB), which had been retained by Northwestern to handle such claims. GAB is a large, nationally known independent claims adjuster. GAB determined the expected liability with respect to that claim based upon its experience and the facts available at that time, and set up that amount in the case *617 reserve. Prior to the payment of a claim, GAB might adjust the reserve upward or downward depending upon further developments (as where a claimant incurred additional medical expenses) and GAB's further experience with respect to that claim in particular and other circumstances generally. Eastland claimed a deduction in the amount of each increase in the case reserve and took into income the amount of each decrease in the case reserve. Both case reserves and IBNR reserves are used by all property and casualty insurance companies. Eastland's case reserves were determined by GAB, the independent claims adjuster, and its IBNR reserves were determined by RMI. Both Eastland's case reserves and IBNR reserves were determined in accordance with industry practice. GAB tended to understate the case reserves. In fact, insurance industry experience shows that the cost of claims for a particular year will generally exceed the amount in the case reserves, hence the need for IBNR reserves. GAB's practice was consistent with industry experience. Claims under policies reinsured by Eastland were resolved in the following manner: GAB had complete authority to settle any claim when the settlement *618 was for $ 1,000 or less. If a claim could not be settled for $ 1,000 or less, GAB would inform Malone & Hyde of any possible settlement in excess of $ 1,000 and the two would discuss their evaluation of the claim prior to settlement. When a payment was to be made in settlement of a claim, GAB issued a draft for that amount on a bank account which was funded by Eastland at $ 50,000 in FY 1979 and $ 75,000 in FY 1980. This funded bank account was the Loss Impress Fund. At the end of each month, Northwestern reimbursed the Loss Impress Fund for the payments made by GAB and then charged Eastland for the reimbursed amount. Eastland's payment of this reimbursed amount was then deducted by Northwestern from the amount that Northwestern owed Eastland, as a reinsurance premium, from Malone & Hyde's monthly premium payment. [8]
*619 When a claim was paid, Eastland took a deduction for the amount paid and took into income the decrease in the case reserve. Consequently, when the amounts of the payment and the case reserve reduction were equal, the deduction and income items offset each other; when the payment exceeded the case reserve reduction, Eastland claimed the difference as a deduction; and when the case reserve reduction exceeded the payment, Eastland took the difference into income. The funds for those case reserves on the books of Eastland were invested by Pinehurst Management in various CD's (certificates of deposit) in the Bank of Bermuda and various other banks. Eastland provided the guidelines for the investments made by Pinehurst Management, and controlled those funds directly or indirectly. During fiscal year 1979, Malone & Hyde paid Northwestern $ 2,613,354 for insurance coverage and deducted this amount in determining its taxable income for that year for Federal income tax purposes. Northwestern retained $ 315,563 of Malone & Hyde's payment. Of this amount, $ 15,027 represented an insurance premium and $ 300,536 represented commission. Northwestern paid $ 295,398 to other third-party insurance *620 companies that reinsured some of these risks. The remaining $ 2,002,393 was reduced by the section 4371 excise tax of $ 20,024 which was paid by Northwestern on Eastland's behalf. Northwestern then paid the remaining $ 1,982,369 to Eastland as a reinsurance premium for FY 1979. During FY 1979, Eastland paid losses with respect to claims filed in the amount of $ 288,246 and showed losses payable on its balance sheet as of June 30, 1979, of $ 82,175. Respondent has allowed these two amounts as an offset against the disallowed reinsurance premiums, i.e., has allowed these amounts as expenses incurred. Eastland also had a case reserve and an IBNR reserve as of June 30, 1979, of $ 477,952 and $ 953,000, respectively. Eastland also paid to GAB a claims service fee of $ 118,422 during FY 1979, which amount respondent has also allowed as an offset. [9]
*621 A Loss and Frequency Summary from Eastland's books sets forth the amounts paid by Eastland plus the changes in Eastland's case reserve with respect to risks insured during FY 1979. The following chart reflects these amounts on an annual basis: Cumulative
Fiscal Year
Amount Paid Plus
Amount Paid
Cumulative
Change
Cumulative
Ending 6/30
Case Reserve
In Year
Amount Paid
In Reserve
Reserve
1979
848,373
370,421
370,421
477,952 477,952
1980
1,409,688
392,022
763,196
168,540 646,492
1981
1,360,894
224,244
987,440
(273,037)
373,454
1982
1,466,558
319,924
1,307,364
(214,261)
159,193
1983
1,501,704
2,083
1,309,447
33,064 192,257
1984
1,461,895
16,081
1,325,528
(55,890)
136,367
1985
1,433,410
169
1,325,697
(28,654)
107,713
1986
1,480,750
0
1,325,697
47,340 155,053
August 1986
1,472,212
146,515
1,472,212
(155,053)
0
During FY 1980, Malone & Hyde paid Northwestern $ 3,047,507 for insurance coverage and deducted this amount in determining its taxable income for that year for Federal income tax purposes. Northwestern *622 retained $ 367,986 of Malone & Hyde's payment. Of this amount, $ 17,523 represented an insurance premium and $ 350,463 represented commission. Northwestern paid $ 312,200 to other third-party insurance companies that reinsured some of these risks. The remaining $ 2,367,321 was reduced by the section 4371 excise tax of $ 23,673, which was paid by Northwestern on Eastland's behalf. Northwestern then paid the remaining $ 2,343,648 to Eastland as a reinsurance premium for FY 1980. During FY 1980, Eastland paid losses with respect to claims filed in the amount of $ 823,050 and showed losses payable on its balance sheet as of June 30, 1980, of $ 161,441. Respondent has allowed these two amounts as an offset against the disallowed reinsurance premiums, i.e., has allowed these amounts as expenses incurred. Eastland also had increased its case reserve and IBNR reserve by $ 704,954 and $ 547,000, respectively in FY 1980. Eastland also paid to GAB a claims service fee of $ 134,811 during FY 1980, which amount respondent has allowed as an offset to Eastland's reinsurance premiums disallowed. [10]
*623 A Loss and Frequency Summary from Eastland's books sets forth the amounts paid by Eastland plus the changes in Eastland's case reserve with respect to risks insured during FY 1980. The following chart reflects these amounts on an annual basis: Cumulative Amount
Fiscal Year
of Losses Paid Plus
Amount Paid
Cumulative
Change
Cumulative
Ending 6/30
Case Reserve
In Year
Amount Paid
In Reserve
Reserve
1980
1,047,708
510,293
510,293
537,415 537,415
1981
1,508,743
554,467
1,064,578
(93,250)
444,165
1982
1,605,196
162,177
1,253,267
(21,145)
351,928
1983
1,630,474
177,951
1,431,218
(152,672)
199,256
1984
1,518,445
50,059
1,481,277
(162,088)
37,168
1985
1,548,415
27,052
1,508,329
2,918 40,086
1986
1,541,103
12,998
1,521,327
(20,310)
19,776
Eastland's books also contained a Loss and Frequency Summary with respect to workers' compensation claims resulting from risks insured during FY 1979. Basically the benefits under the workers' compensation laws of the various states are set by statute. GAB, the independent claims adjuster, determined the reserves for reported, uncontested *624 workers' compensation claims based on these statutorily-determined benefits, GAB's own experience, and all of the facts and circumstances pertaining to each particular claim that were known to GAB and Malone & Hyde. These reserves were determined in accordance with industry practice, and generally these reserves were a fair, but somewhat understated, estimate of what the expenses would be. The amount of the case reserve with respect to risks insured during FY 1979 attributable to workers' compensation claims was $ 152,910 at year-end FY 1979 and $ 115,931 at year-end FY 1980. At year-end FY 1984, according to Eastland's books and records, Eastland had paid $ 633,202 in workers' compensation claims with respect to risks insured during FY 1979. In addition, the amount of the case reserve with respect to risks insured during FY 1980 attributable to workers' compensation claims was $ 286,048 at year-end FY 1980. At year-end FY 1984, Eastland had paid $ 790,157 in workers' compensation claims with respect to risks insured during FY 1980. According to Eastland's books and records, the net premiums "written" by Eastland have been as follows: Fiscal
Year
Malone & Hyde Risk
Other Party Risk
Total
1979
* $ 2,002,393     --       $ 2,002,393
1980
* 2,367,321     --       2,367,321
1981
3,115,276     --       3,115,276
1982
3,033,376     $ 3,151,279   6,154,605
1983
3,391,425     3,424,764   6,816,189
1984
3,599,999     3,008,915   6,608,914
1985
4,487,657     530,907   5,018,564
1986
0         0      0   Total
$ 21,997,447     $ 10,115,865   $ 32,083,262
*625 For the years before the Court, the "net premiums written" by Eastland simply represent the gross reinsurance premiums remitted by Northwestern before deduction of the section 4371 excise tax that Northwestern paid on Eastland's behalf. The vast majority, about 95 percent, of the "Other Party Risk" for years subsequent to those before the Court was Malone & Hyde's retail-grocerystore customers and only about five percent was completely unrelated third-party insureds. According to its books and records, Eastland has made the following payments with respect to Malone & Hyde risks: Fiscal Year
Losses Paid
1979
$    488,843
1980
1,037,126
1981
1,533,947
1982
2,015,196
1983
2,262,235
1984
2,463,722
1985
3,334,230
1986
2,688,843
Total
$ 15,824,142
According to its books and records, Eastland's cumulative case reserve with respect to Malone & Hyde risks was as follows: Fiscal Year
Cumulative Case Reserve
1979
$   477,952
1980
1,183,908
1981
1,791,862
1982
2,496,601
1983
3,268,086
1984
3,596,832
1985
4,375,721
1986
2,712,589
*626 Eastland's entire profit, as reflected on its books and records, was included in Malone & Hyde's Subpart F income under section 951, in the amounts of $ 98,552 and $ 350,929, for fiscal years 1979 and 1980, respectively. In the Notice of Deficiency, respondent has disallowed as a deduction for Federal income tax purposes all premiums paid by Malone & Hyde to Northwestern in FY 1979 and 1980, which in turn were paid as reinsurance premiums to Eastland. The disallowed reinsurance premiums totaled $ 2,002,393 in FY 1979 and $ 2,367,321 in FY 1980. [11] Due to such an adjustment, respondent further determined in the Notice of Deficiency that the Subpart F income from Eastland reported by Malone & Hyde on its income tax return filed for each of the fiscal years 1979 and 1980 should be decreased by $ 20,454 and $ 11,085, respectively. OPINION I CAPTIVE INSURANCE COMPANY ISSUE The first issue is whether Malone & Hyde is entitled to deduct as ordinary and necessary business expenses those portions of the amounts *627 it paid to Northwestern as insurance premiums in its fiscal years 1979 and 1980 that were in turn paid by Northwestern to Malone & Hyde's wholly owned insurance subsidiary, Eastland, as reinsurance premiums. This so-called "captive insurance company" issue is not new to this or other courts. Insurance is not defined by the Internal Revenue Code, but the Supreme Court long ago held that for insurance to exist, two elements must be present: risk shifting and risk distribution. Helvering v. Le Gierse, 312 U.S. 531, 539 (1941). Applying this common and historical definition of insurance, this Court has, in a number of cases similar to the present one, held that the parent corporation's direct or indirect payments to the captive subsidiary, designated as insurance or reinsurance premiums, do not represent payments for "insurance" and hence are not deductible as insurance payments. Humana Inc. and Subsidiaries v. Commissioner, 88 T.C. 197 (1987), affd. on this parent-subsidiary issue 881 F.2d 247 (6th Cir. 1989); Clougherty Packing Co. v. Commissioner, 84 T.C. 948 (1985), affd. 811 F.2d 1297 (9th Cir. 1987); *628 Carnation Co. v. Commissioner, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), cert. denied 454 U.S. 965 (1981). [12] In those cases we held that no risk shifting had occurred. The arrangement was merely equivalent to a reserve for losses or self-insurance, which is not deductible. Those cases are dispositive of the parent-subsidiary issue before us and we need not repeat here our earlier extended analyses of the issue. Unlike the situation in Humana Inc. and Subsidiaries v. Commissioner, supra, here petitioner does not raise the brother-sister corporation issue. *629 The facts in the present case show that only the parent corporation, Malone & Hyde, made the payments to Northwestern. There is no suggestion that any of the subsidiaries made any payments or that Malone & Hyde in any way charged back any portion of those payments to the subsidiaries, as was done by Humana Inc. For these reasons we need not address the brother-sister corporation issue. [13] Also we need not consider the letters of credit and the hold harmless agreement in this case, facts that might establish that no shifting of risk occurred in any event. In this case, *630 as in the above cases, we are presented with a wholly owned insurance company [14] that, at least during the years before us, insured only risks of the parent corporation and its subsidiaries. In other words, Eastland insured (reinsured) only risks of Malone & Hyde and its subsidiaries. For subsequent years that are not before the Court, the fact pattern changed. The captive insurance company later began insuring (reinsuring) unrelated third-party risks, primarily Malone & Hyde's customers, the independent retail grocery store owners, and to a negligible extent wholly unrelated third parties. Because of this changed fact pattern, petitioner asks us to extend, indeed to go well beyond, our holding in Gulf Oil Corp. v. Commissioner, 89 T.C. 1010 (1987). We decline to do so, and any discussion as to what we might do in a future case would be mere dicta. In Gulf Oil Corp., we were faced for the first time with a wholly owned captive that, at least for one of the two years before the Court, insured *631 unrelated third-party risks as well as those of the affiliated group. However, the percentage of premium income from insuring unrelated third-party risks was only two percent, an amount which we considered de minimis and which under any and all of the approaches discussed in the majority and concurring opinions was inadequate to satisfy us that any risk distribution had occurred. A fortiori, here, where the percentage of outside premium income was zero, we conclude that the payments did not represent deductible insurance or reinsurance premiums because no risk shifting or risk distribution had occurred. [15] The payments constituted essentially a reserve for losses or self-insurance, and are nondeductible unless and until losses (expenses) are incurred and properly accruable. *632 II
UNCONTESTED WORKERS' COMPENSATION CLAIMS Since we have held that the portions of Malone & Hyde's payments to Northwestern that were paid by Northwestern to Eastland as reinsurance premiums are not deductible by Malone & Hyde as insurance payments, we reach the alternative issue in this case. That alternative issue is whether or not that part of Malone & Hyde's payments that constituted net additions to Eastland's case reserve for filed and uncontested workers' compensation claims may be deducted by Malone & Hyde. [16] This depends on whether the requirements of the "all events" test for accruability have been satisfied. Malone & Hyde says they have been. Respondent argues to the contrary. We agree with Malone & Hyde. *633 Whether a business expense, such as workers' compensation claims, has been "incurred" so as to entitle an accrual-basis taxpayer to deduct it under section 162(a) is governed by the "all events" test. United States v. General Dynamics Corp., 481 U.S. 239, 242-243 (1987); United States v. Hughes Properties, Inc., 476 U.S. 593, 599-600 (1986); United States v. Anderson, 269 U.S. 422, 441 (1926); sec. 1.461-1(a)(2), Income Tax Regs. As these authorities show, the "all events" test has two elements, each of which must be satisfied before an expense can be accrued and deducted: (1) all events that determine the fact of liability must have occurred, and (2) the amount of the liability must be capable of determination with reasonable accuracy. [17] A liability does not accrue as long as it remains contingent. *634 Thus, to satisfy the "all events" test, the taxpayer must show that the liability is "final and definite in amount," "fixed and absolute," and "unconditional." United States v. Hughes Properties, Inc., supra, 476 U.S. at 600 (quoting Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 287 (1944); Brown v. Helvering, 291 U.S. 193, 201 (1934); and Lucas v. North Texas Lumber Co., 281 U.S. 11, 13 (1930), respectively.) It is "fundamental to the 'all events' test that, although expenses may be deductible before they have become due and payable, liability must first be firmly established," and the liability must not be contingent. United States v. General Dynamics Corp., supra, 481 U.S. at 243. A taxpayer may not deduct an estimate of an anticipated expense, no matter how statistically certain, if liability for such expense depends on events that have not occurred by the close of the taxable year. United States v. General Dynamics Corp., supra, 481 U.S. at 243-244; Brown v. Helvering, supra, 291 U.S. at 201; Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 33-34 (1988). *635 It is the certainty of the liability that determines the taxpayer's right to accrue it, and therefore the fact of liability must precede any consideration of the accuracy of the amount to be accrued. The purpose of the first prong of the "all events" test is to prevent taxpayers from deducting expenditures that may never occur. World Airways, Inc. v. Commissioner, 62 T.C. 786, 802 (1974), affd. 564 F.2d 886 (9th Cir. 1977). The Supreme Court and this Court have recognized that the timing of the moment at which liability is fixed is essential. United States v. Hughes Properties, Inc., supra, 476 U.S. at 599; Hallmark Cards, Inc. v. Commissioner, supra.A mere estimate of liability based on events that have not occurred before the close of the taxable year does not satisfy the first prong of the "all events" test. United States v. General Dynamics Corp., supra, 481 U.S. at 244. In that case, injuries had occurred and medical services had been rendered to the injured employees, but the employees had not yet filed their claims with the employer. The employer-taxpayer argued that liability accrued upon *636 the rendering of the medical services. The Supreme Court disagreed, holding that the filing of claims by the employees was not a mere technicality but instead was crucial to the establishment of liability on the part of the taxpayer. The Supreme Court characterized the filing of the claim in that case as "a true condition precedent to liability on the part of the taxpayer" (481 U.S. at 244 n.5) and held that "as a matter of law, the filing of a claim was necessary to create liability." 481 U.S. at 244 n.4. The General Dynamics Corp. case involved the employer's contractual medical care plan. The instant case involves workers' compensation claims under workers' compensation statutes of various states. Workers' compensation statutes provide absolute liability on the part of the employer once an employee is injured or killed in the course of his employment. The liability is normally deemed to accrue at the time of the death or injury of the employee, not at the time medical services are rendered or at the time payments are actually made to or on behalf of the employee. ESCO Corp. v. United States, 750 F.2d 1466 (9th Cir. 1985); Kaiser Steel Corp. v. United States, 717 F.2d 1304 (9th Cir. 1983); *637 Wien Consolidated Airlines, Inc. v. Commissioner, 528 F.2d 735 (9th Cir. 1976), affg. 60 T.C. 13 (1973); [18]ImperialColliery Co. v. United States, 599 F. Supp. 653 (S.D. W. Va. 1984). In the comparable situation under a contractual medical plan, the Supreme Court's opinion in United States v. General Dynamics Corp., supra, also indicates that liability accrues at the time of the filing of the injured employee's claim and not at the time of the rendering of medical services.[19]
*638 Contrary to respondent's contentions, here the record shows and we have found as a fact that the net additions to the case reserves attributable to workers' compensation claims relate only to filed and uncontested claims. This case does not involve the IBNR (incurred but not reported claims) reserves. The additions to case reserves for which Malone & Hyde seeks a deduction involve only instances where injury or death has occurred, the employee's claim has been filed, and the employer does not contest the claim. Respondent essentially argues that "all events" have not occurred to fix the fact of liability until the amount of liability is known with complete accuracy. Respondent confuses the two prongs of the test and improperly tries to fuse the two-pronged inquiry into a single one. Kaiser Steel Corp. v. United States, supra, 717 F.2d at 1306. While a reasonable estimate of liability alone cannot establish the fact of liability if all facts establishing liability have not yet occurred by the end of the taxable year ( Hallmark Cards, Inc. v. Commissioner, supra), that is not the case here. All of the facts to establish liability had occurred: *639 an injury or death in the course of employment, the filing of the employee's claim, and no contest by the employer. Nothing remained to be done to establish liability. Respondent's reliance on SupermarketsGeneral Corp. v. United States, 537 F. Supp. 759 (D. N.J. 1982), is misplaced. There the taxpayer improperly tried to use the second prong to satisfy the first-prong requirement of a fixed liability. (Compare respondent's similar (and equally unsuccessful) effort in Hallmark Cards, Inc. v. Commissioner, supra, 90 T.C. at 34.) In Supermarkets General Corp., the taxpayer sought to use a reasonable estimate of the amount of tort claims to fix liability, but at the same time the taxpayer continued to contest those claims, hence there could be no fixed liability. Here the liability for the worker's compensation claims is fixed. Respondent's arguments go only to the ultimate amount that might be paid or to the potential of nonpayment that exists in any accrual situation. In other words, these are conditions subsequent, factors that might relieve or diminish an already fixed liability. Burnham Corp. v. Commissioner, 90 T.C. 953 (1988), *640 affd. 878 F.2d 86 (2d Cir. 1989). All of the facts to fix liability had occurred by the end of the year, and nothing remained to be done to establish liability. Accordingly, the first prong of the "all events" test has been satisfied. We think the second prong, that the amount be determined with reasonable accuracy, has also been satisfied. The net addition to the case reserves attributable to these uncontested workers' compensation claims each year was, if anything, understated. The regulations contemplate that a computation made "with reasonable accuracy" can be adjusted when the exact amount is later determined: Where a deduction is properly accrued on the basis of a computation made with reasonable accuracy and the exact amount is subsequently determined in a later taxable year, the difference, if any, between such amounts shall be taken into account for the later taxable year in which such determination is made. [Sec. 1.461-1(a)(2), Income Tax Regs.] We think that the reasonable accuracy of the estimates here is sufficiently assured by the fact that GAB, a large, nationally known independent claims adjuster, determined the amounts of these case reserves *641 and determined these case reserves in accordance with industry practice. For the workers' compensation claims, GAB took into account the statutorily-determined benefits under the workers' compensation laws of the various states, its own experience, and all of the facts and circumstances pertaining to each claim that were known to GAB and Malone & Hyde. We have found that the case reserves were generally a fair, but somewhat understated, estimate of what the expenses would be. Moreover, the insurance industry experience shows that the amounts in the case reserves each year will generally be less than the actual costs for the claims, hence the reason for the IBNR reserves. However, the fact that case reserves may generally be understated in this specific instance as well as in industry practice generally should establish that at least that minimum amount is reasonable and accruable. It is not clear whether or not respondent actually challenges the reasonableness of these amounts, but, if so, we reject respondent's position. Accordingly, we conclude that Malone & Hyde has satisfied both prongs of the "all events" test and is entitled to deduct the net additions to case reserves *642 that relate to these uncontested workers' compensation claims. [20]
III CONTESTED CLAIMS IN LOSS IMPRESS FUND The last issue is whether the amount transferred by Eastland to GAB for the contested claims in the Loss Impress Fund is deductible under section 461(f). Malone & Hyde presents this as an alternative argument, but the second issue involved uncontested workers' compensation claims whereas this issue involves contested claims. A contested claim cannot be considered as "incurred" under the "all events" test and cannot be accrued under normal principles of accrual accounting. Section 461(f) provides a narrow exception to normal accrual accounting rules and was enacted to change the results of United States v. Consolidated Edison Co., 366 U.S. 380 (1961), where the Supreme Court had ruled that a tax that had actually been paid could not be accrued and deducted as long as the contest as to the liability for that tax continued. *643 See Consolidated Freightways, Inc. v. Commissioner, 708 F.2d 1385, 1392 (9th Cir. 1983), affg. in part and revg. in part 74 T.C. 768 (1980). Section 461(f) provides as follows: (f) Contested Liabilities. -- If -- (1) the taxpayer contests an asserted liability, (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability, (3) the contest with respect to the asserted liability exists after the time of the transfer, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year), then the deduction shall be allowed for the taxable year of the transfer. This subsection shall not apply in respect of the deduction for income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States. The factual record in regard to the Loss Impress Fund is rather skimpy. The Loss Impress Fund is just a bank account that GAB used to pay claims. The parties stipulated, and we have found as facts, that Eastland [21] funded this bank account at $ 50,000 *644 in FY 1979 and at $ 75,000 in FY 1980, and that at the end of each month Northwestern reimbursed the Loss Impress Fund for payments made by GAB and then charged Eastland for the reimbursement amount. The contract between GAB and Northwestern details the payments to GAB for its services as the claims adjuster for Malone & Hyde's auto liability, general liability, and workers' compensation claims. GAB had the sole authority to settle and pay any claim up to $ 1,000, and payments of such claims, whether contested or uncontested and whether auto liability, general liability or workers' compensation claims, were apparently made out of the Loss Impress Fund. The agreement between GAB and Northwestern actually provided that "GAB shall issue its drafts in payment of losses, claims and expenses on behalf of Malone and Hyde Inc.," with Northwestern agreeing to promptly reimburse GAB for such amounts. That agreement further provided: Northwestern National Insurance Company acknowledges *645 that its claims for Malone and Hyde, Inc. will be paid with GAB funds. In lieu of compensating GAB for the use of its funds, Northwestern National Insurance Company agrees to make a substantially equivalent amount of funds available to GAB for GAB's unrestricted use for any lawful corporate purpose. This funds availability is initially set at fifty thousand 00/100 dollars ($ 50,000.00), and Northwestern National Insurance Company agrees to deposit this sum with GAB upon the signing of this agreement. GAB will acknowledge receipt of the funds and its obligation to return such funds to Northwestern National Insurance Company in accordance with the provisions of this agreement. [Emphasis added.] This $ 50,000 "funds availability" is the Loss Impress Fund. Thus, GAB used its own funds to pay claims, and the later reimbursed amounts could be used by GAB "for any lawful corporate purpose," not just for payment of claims, contested or otherwise. On the record in this case, we cannot find that the Loss Impress Fund represented a "transfer" of money or property "to provide for the satisfaction of the asserted liability," as required by section 461(f). See Specialized Services, Inc. v. Commissioner, 77 T.C. 490 (1981). *646 We cannot find that there was a payment "to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest * * *," as required by section 1.461-2(c)(1), Income Tax Regs.[22]Consolidated Freightways, Inc. v. Commissioner, 74 T.C. 768, 801 (1980), affd. on this issue, revd. on an unrelated issue 708 F.2d 1385, 1391 (9th Cir. 1983); Rosenthal v. United States, 11 Cl. Ct. 165, 172-173 (1986). Whether or not the claimants must actually agree to the establishment of an escrow or trust fund or actually sign such a document, the facts here simply do not show that this bank account used by GAB to pay claims constituted an escrow arrangement or a trust fund for the payment of contested claims. Poirier & McLane Corp. v. Commissioner, 63 T.C. 570 (1975), revd. and remanded on the secret trust issue 547 F.2d 161, 166 (2d Cir. 1976). GAB essentially used its own funds to pay claims, and the Loss Impress Fund and later reimbursed amounts thereto *647 were a substitute for payments for the use of GAB's funds. *648 The facts in regard to the Loss Impress Fund here simply do not bring that fund within section 461(f). The purpose of section 461(f) is to enable a taxpayer to more "realistically and practically match receipts and disbursements attributable to specific years" than if the taxpayer used general income tax accounting rules. Specialized Services, Inc. v. Commissioner, supra, 77 T.C. at 500-501. In fact since the fund here was used to pay claims and since the fund was replenished each month, it seems likely that most of these amounts have already been allowed as losses paid or as losses payable on the balance sheet at the end of each fiscal year. In any event, Malone & Hyde has failed to establish that any portion of the Loss Impress Fund represents a transfer of money to provide for the satisfaction of an asserted liability. Malone & Hyde has not established that it comes within either the statutory or regulatory language or within the purpose of the narrow exception carved out by section 461(f). We sustain respondent on this issue. Decision will be entered under Rule 155. Footnotes
1. Numerous issues have been resolved by the parties as set out in paragraphs 41, 42, and 43 of their Stipulation of Facts.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Historically, the statutes and the case law have spoken of "workman's compensation," but following the modern trend we use the gender-neutral terminology "worker's or workers' compensation." See Justice O'Connor's dissenting opinion in United States v. General Dynamics Corp., 481 U.S. 239 (1987), and Supermarkets General Corp. v. United States, 537 F. Supp. 759, 764 (D. N.J. 1982). The Wall Street Journal newspaper reported in its August 15, 1989, edition that only Alabama and American Samoa still retain the statutory terminology "workman's↩ compensation." (Emphasis added.)
4. As explained in an earlier Johnson & Higgins report prepared for Malone & Hyde: A captive is simply an insurance entity controlled by a non-insurance oriented corporation generally limited in scope to those risks which the parent company is willing and able to assume. * * * [C]orporations form captive insurance companies today because in many cases it affords them a better vehicle for funding their insurance risks and related insurance costs. A reinsurance captive normally receives none of its business directly from the entities insured, but rather indirectly through a commercial insurance company under an arrangement whereby the commercial company issues all necessary policies and has all direct dealings with the insured entities, usually through an intermediary broker. The commercial insurance company then cedes (reinsures) to the captive an agreed percentage or dollar amount of the risk insured by such policies. This type of approach allows you to pass on the normal details of handling and service to a qualified insurance carrier without sacrificing the principal benefits of a captive. ↩
5. Some of the pertinent provisions of RMI's Feasibility Report are summarized as follows: (a) The insurance subsidiary is financially feasible and will return the following benefits: 1) retained cash of $ 1 million in year one and approximately $ 3.8 million in year five; 2) investment income return of $ 38,000 in year one increasing to $ 218,000 in year five; and 3) expected cost savings of approximately $ 70,000 and a potential savings of $ 200,000 over the current insurance program without investment income credit, if good loss experience develops, or a potential loss of $ 70,000 if adverse excess insurance losses are experienced. (b) The subsidiary insurance company is a form of self-insurance for all but the largest losses. The structure of the reinsurers would be layered so as to have the captive insurance subsidiary "retain the regular and predictable losses." (c) The administration, settlement service, and payment of all claims within the first $ 150,000 will be done by an outside claims administration firm such as General Adjustment Bureau (GAB), under the direction of Malone & Hyde. This control of the loss expense will allow improved visibility and control of settlements and attorney costs. The excess reinsurance premiums will be paid by Northwestern National to the reinsurance companies. The net premium after payout of excess reinsurance is composed of reserves, minor operating costs, and underwriting profit sent to the captive insurance subsidiary. Thus, the proposed insurance subsidiary will be accepting the necessary funding for the first $ 150,000 of loss exposure. (d) Bermuda should be the site for the offshore insurance subsidiary due to its reduced insurance regulations (from the regulations imposed by domestic states) which would permit the insurance subsidiary to: 1) invest its reserves without the stringent restrictions imposed by state insurance laws; 2) assume larger participations in company risks such as Workers' Compensation than would be permitted by domestic regulations; 3) begin operation with much lower paid-in-capital than allowed by most states; 4) avoid costly and time-consuming reporting and examination procedures imposed upon domestic insurers; and 5) write insurance outside of the parent company's risks.↩
6. A Hold Harmless Agreement is a contractual arrangement whereby one party assumes the liability in a situation, thereby relieving the other party of responsibility. ↩
7. After the audit began in this case, a letter dated July 20, 1982, from Northwestern purported to retroactively revoke the Hold-Harmless Agreement. At the same time, Eastland was required not to declare or pay any dividends or make any distribution on any of its capital stock or make any loans directly or indirectly to any stockholder that would cause Eastland's capital or surplus to be reduced below $ 1,500,000. Also the letter of credit to Northwestern had to be increased.↩
8. On brief respondent argues that these reductions somehow reduced the amount Eastland actually received as reinsurance premiums, but paragraph 18 of the parties' stipulation of facts shows the amount of $ 2,002,393 that Eastland received as reinsurance premiums. This $ 2,002,393 is also the amount by which petitioner's income was increased for FY 1979 for insurance premiums disallowed. The $ 2,002,393 was reduced by the $ 20,024 section 4371 excise tax that Northwestern paid on Eastland's behalf and respondent now concedes this $ 20,024 is a proper offset against Eastland's reinsurance premiums disallowed. See n.9, infra↩.
9. The parties have stipulated that Eastland also paid in FY 1979 $ 40,000 in management fees to Pinehurst Management, and $ 1,297 for a letter of credit and has amortized $ 1,401 in organizational fees. Respondent now concedes petitioner is entitled to offset these amounts against Eastland's reinsurance premiums disallowed.↩
10. The parties have stipulated that Eastland also paid in FY 1980 $ 42,000 in management fees to RMI and Pinehurst Management and $ 578 for a letter of credit and has amortized $ 700 in organizational fees. Respondent now concedes petitioner is entitled to offset these amounts against Eastland's reinsurance premiums disallowed.↩
*. These are the Eastland reinsurance premiums disallowed to Malone & Hyde by respondent's deficiency notice.↩
11. These figures do not take into account the various offsets discussed above that respondent now concedes, and hence these figures will be reduced by such offsets.↩
12. Other courts confronted with the captive insurance company issue have also disallowed deductions for purported premium payments to a captive insurance subsidiary, although on legal theories not necessarily adopted by us. Beech Aircraft Corp. v. United States, 797 F.2d 920 (10th Cir. 1986); Stearns-Roger Corp. v. United States, 774 F.2d 414 (10th Cir. 1985); Mobil Oil Corp. v. United States, 8 Cl. Ct. 555 (1985); contra Crawford Fitting Co. v. United States, 606 F. Supp. 136↩ (N.D. Ohio 1985).
13. The United States Court of Appeals for the Sixth Circuit reversed this Court on the brother-sister corporation issue in Humana Inc. and Subsidiaries v. Commissioner, 881 F.2d 247 (6th Cir. 1989), revg. 88 T.C. 197 (1987), on this issue. Any appeal in the present case will lie to the Court of Appeals for the Sixth Circuit. Under our Golsen rule, we would follow the clear legal precedent of that circuit. Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971).
14. We assume, for purposes of this discussion, that the offshore subsidiary, Eastland, with its capitalization of only $ 120,000 constituted an insurance company.↩
15. Petitioner candidly acknowledged on brief that the Court would probably so hold. Conceding that its case is similar to Gulf Oil Corp. v. Commissioner, 89 T.C. 1010↩ (1987), petitioner nevertheless argues that its case is, in at least two respects, stronger than Gulf's: (1) that, unlike Gulf, petitioner from the outset contemplated that its insurance subsidiary would insure the risks of unrelated parties and (2) that by its fourth year of operation more than 50 percent of its business was insurance risks of unrelated parties, whereas Gulf did not reach this level until its seventh year of operation. In summary petitioner argues that "Malone & Hyde was committed to insuring third-party risks sooner than, and its insurance subsidiary acted on that commitment sooner than did, Gulf's insurance subsidiary." While petitioner has valiantly marshalled its facts and arguments, these are little more than variations on its original theme that its insurance subsidiary was organized and operated for valid business purposes and was not organized and operated to avoid tax. Such factors are not determinative as to what constitutes "insurance." Risk shifting and risk distribution are determinative. In the years before the Court, the fact remains that there was no risk shifting or risk distribution.
16. Respondent makes a broadbrush argument that since those payments are not deductible as insurance payments, they are not deductible at all. Respondent misconstrues our holdings in the captive insurance cases. In those cases we held that the parent corporation's direct or indirect payment to its captive insurance subsidiary was not deductible as insurance and was not otherwise deductible as a business expense under section 162(a) because it amounted to a nondeductible reserve for losses or self-insurance. However, we were not asked to and we did not consider whether some portion of such payment might be attributable to an incurred loss or workers' compensation expense otherwise deductible under normal principles of accrual accounting.↩
17. The "all events" test has now been incorporated into the Internal Revenue Code by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 598, 607, 26 U.S.C. sec. 461(h)(4) (1981 ed. Supp. III). Section 461(h) imposes limits on the application of the test, providing that "in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." Sec. 461(h)(1); United States v. General Dynamics Corp., 481 U.S. 239, 243 n.3 (1987). Section 461(h)(2)(C) specifically provides in regard to workers' compensation claims that economic performance occurs as the payments are made. However, section 461(h)↩ is prospective only and does not apply in this case.
18. See also Buckeye International, Inc. v. Commissioner, T.C. Memo. 1984-668↩. 19. The Tax Court had earlier taken the position in workers' compensation cases that the liability was not fixed upon the injury of the employee but upon the rendering of medical services or payment. Crescent Wharf & Warehouse Co. v. Commissioner, 59 T.C. 751 (1973), revd. and remanded 518 F.2d 772 (9th Cir. 1975); Thriftimart, Inc. v. Commissioner, 59 T.C. 598 (1973), remanded without published opinion (9th Cir., Dec. 10, 1975). As we discussed in Buckeye International, Inc. v. Commissioner, supra↩, those cases are distinguishable.
20. In his briefs, respondent suggests he has already allowed all uncontested claims and hence may have already allowed some of these amounts. The parties can eliminate any possible duplications in their Rule 155 computations.↩
21. Actually Northwestern, not Eastland, retained GAB to handle all of the Malone & Hyde claims. The only documentation in regard to the Loss Impress Fund is the contract between GAB and Northwestern.↩
22. Section 1.461-2(c)(1), Income Tax Regs., provides in full as follows: (c) Transfer to provide for the satisfaction of an asserted liability -- (1) In general. A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest, or (iii) to an escrowee or trustee pursuant to an order of the United States, any State or political subdivision thereof, or any agency or instrumentality of the foregoing, or a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest. Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.↩